Argued January 23, affirmed March 27, reargued June 20, former opinion adhered to September 6. (Motion for allowance of attorneys fee Oct. 19, allowed in part November 20, 1957)

# KING v. STATE INDUSTRIAL ACCIDENT COMMISSION

## COMMISSION

309 P. 2d 159
315 P. 2d 148
318 P. 2d 272

*Joe B. Richards,* Eugene, argued the cause for respondent. With him on the brief were Luvaas & Cobb, Eugene.

*Earl M. Preston,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Robert Y. Thornton, Attorney General, and Ray H. Lafky, Assistant Attorney General, Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and MCALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant, State Industrial Accident Commission, from a judgment in favor of the plaintiff, Elsie King, which the circuit court entered in a proceeding instituted by her as the widow of Lyle M. King to recover compensation for her husband's death. The judgment was entered after a jury had found that (1) at the time of his death King was an employee of a firm entitled Huber & Fisher; (2) King was engaged in a hazardous occupation; and (3) the accident which resulted in the death arose out of and in the course of King's employment.

The death of Lyle M. King, to whom we will refer as King, occurred through drowning January 2, 1954,

after he had entered a small boat at Waldport on Alsea Bay. After the death, the plaintiff filed with the defendant Industrial Accident Commission a report of it. September 3, 1954, the defendant rejected the claim for compensation benefits. January 20, 1955, the commission reaffirmed its order. February 7, 1955, this proceeding was instituted.

The complaint alleged that at the time of the fatal accident, King was an employee of the aforementioned partnership, that he and the partnership were engaged in a hazardous occupation and that the work consisted of "construction of a log raft, placing of boom sticks, repairing a pile driver, and driving of piling at the logging operation of his employer on Alsea Bay near Waldport." Further, the complaint alleged that the defendant rejected the claim for compensation benefits "on the grounds that the deceased was an independent contractor and not subject to the provisions of the Workmen's Compensation Law on the date of said death." The answer admitted the averment last quoted. Other parts of the complaint, which the answer denied, stated that King "was an employee of Huber & Fisher at the time of his death." In the manner just indicated, the issue was created to which the parties have devoted their principal efforts; that is, was King at the time of the accident an employee of Huber & Fisher or was he an independent contractor.

The following is a copy of the jury's verdict:

"1. Was Lyle M. King on January 2, 1954, an employe of Huber and Fisher and while in such employ engaged in a hazardous occupation?

"Answer: — yes — (yes or no).

(If your answer is 'no,' you need not answer Question 2. If your answer is 'yes,' then you will answer the following question.)

"2. Did the accident and resultant death of Lyle M. King on January 2, 1954, arise out of and in the course of his employment as an employee for Huber and Fisher?

"Answer: — yes — (yes or no)."

The challenged judgment remanded the claim to the defendant

"to cancel and set aside its orders of September 1, 1954 and January 20, 1955, and that she be granted widow's benefits and that her minor children, Judy Kay King and Larry D. King, be allowed benefits as surviving dependent children  *  *  *."

If the trial in the circuit court was free from prejudicial error and if the verdict is supported by substantial evidence, the challenged judgment must be affirmed. The following is a synopsis of the evidence.

The firm of Huber & Fisher was engaged in the logging industry in the area adjacent to Alsea Bay. King had entered into a contract with the firm whereby he agreed to fell trees, buck the logs and skid them to the bay. The place of the operations was about two miles across the bay from Waldport. In conducting his operations, King had three employees. One was his son Alton, another his son-in-law Loren McWhorter and the third, Henry King, seemingly was his brother. The record affords scant information as to the terms of the logging contract which King had with Huber & Fisher, but indicates that it was in parol and that operations began in October. Sometime after the logging got under way the site was shifted and in consequence provision had to be made whereby the logs that were brought to the bay by King could be cared for. Thereupon Huber & Fisher decided to construct a log boom for the reception of the logs and incidental thereto to drive piling so that the boom sticks which would form one side of the log boom could be fastened to the piling,

thereby preventing the boom from floating away. Since no pile driver was available, it was necessary to construct one. King and his three aforementioned helpers were engaged by Huber & Fisher to build the pile driver. After it had been constructed, Huber & Fisher transported it to the place where it would be used, and then King and his crew were employed to drive the piles and string the boom sticks. Parts of November and December were devoted to the work which we just mentioned. One witness testified that at the time of King's death (January 2, 1954) "the lower end" of the log boom was not finished. Another said that about ten or fifteen of the boom sticks had been strung and that six or seven more remained to be put in place. While King and his fellow workers were performing the above-described work, the logging operations were suspended.

The above shows that King performed two types of service for Huber & Fisher; one consisted of logging and the other of construction work. Both parties agree that the logging (falling, bucking and skidding) was performed under an agreement which constituted King an employer. King was, in fact, registered with the commission as an employer engaged in logging. The parties are at issue as to King's status while he and the other three men were engaged in constructing the pile driver and the log boom.

January 2, 1954, King, who lived about 55 miles from Waldport, left his home at 6:00 a. m. in his pickup truck and shortly called at the homes of two, or possibly all three, of the men with whom he worked. The group drove to a dock at Waldport where King kept a boat, 14 feet long, equipped with a seven-horse-power motor. He and the other three men generally used the boat in crossing the bay to the scene of their work. After he

had left his home King was not seen alive by any person who testified. His body and that of his three companions were later found in the bay—all had drowned. Likewise, the upturned boat and its motor were found in the bay. King's watch had stopped at 9:05 a. m. When his body was found it was seen that he was wearing his working clothes including his logging boots. The shoes which he wore when he left home were in the truck. No one claims that King or any of his companions had reached the site of the incomplete log boom. Evidence indicates that during the night before the fatality a storm had come in from the ocean and the water of the bay had become rough. In the morning when death struck, an exceptionally high tide was running. The boat which King possessed would have been necessary to their work of stringing the log sticks had that been the work for which they were headed. The trip across the bay, two miles in length, was the only means by which the group could have reached the boom which they were constructing, for the other route by automobile was impassable at high tide.

The defendant contends that the record contains no evidence showing that King was an employee of Huber & Fisher. It argues that King worked upon the pile driver and the log boom as an independent contractor. If that is true, the record contains no evidence as to the amount which King was to receive for his work. The plaintiff submits that King and his three fellow workers built the pile driver, operated it and were constructing the log boom as employees of Huber & Fisher. According to her, they worked for wages which were based upon an hourly scale.

ORS 656.202 says:

"If any workman * * * sustains a personal injury by accident arising out of and in the course

of his employment  *  *  *  he or his beneficiaries, if the injury results in death, shall receive compensation  *  *  *."

ORS 656.124 says:

"If any person engaged in a business subject to  *  *  *  as an employer, in the course of such business, lets a contract the principal purpose of which is the performance of labor, such labor to be performed by the person to whom the contract was let or by such person with the assistance of others, all workmen engaged in the performance of the contract are deemed workmen of the person letting the contract, if the person to whom the contract was let was not engaged in a separate business involving the occupation covered by the contract at the time of commencing the performance of the contract."

We shall now summarize the evidence which the plaintiff presented upon the issue of which we have just taken note. It was received over the objections of the defendant, and the rulings which admitted it are the subject matter of assignments of error to which we will later give attention.

Lawrence C. Huber, a member of Huber & Fisher, gave the following testimony:

"Q  As a matter of fact, did Mr. Lyle King do other work for Huber & Fisher in the late part of 1953 as an employee of Huber & Fisher, as well as the work he had done as an independent contractor?

"A  In the late part he did. I might clarify this a little bit. Due to the movement of this next setting which required putting the logs into the water over a tide flat, instead of putting them into the water over a rollway, which had been the case prior to bad weather, why it involved driving some piling into the channel across a distance of about a thousand feet of tide flat, and stringing some boom logs out there to corral the logs as they come in. It

was necessary to construct a pile driver, as there was no facilities of driving piling on the river, and in addition there was other specific work they could have done later on and done the welding. We decided to construct the pile driver and use it for putting this work, piling in for our own operation, and then at a later date I agreed with Mr. King that he would work, he and his crew, for driving on the river. That work at that time would be doing work for us, and at the time doing work on the pile driver as construction work would be doing it for ourselves.

\* \* \* \* \*

"Q In all of their pile driving activities then, you would say they were acting as your employees?

"A Yes. Agreed to pay them for the work they did on the water."

Another part of Mr. Huber's testimony is the following:

"Q At the time Lyle King and his men were driving this piling, did you consider them your employees in that case?

"A Yes.

"Q On an hourly basis?

"A I paid them by the hour. . . . Paid at the rate of $2.00 an hour, such as that.

\* \* \* \* \*

"Q Had the Kings, include Lyle King, been engaged in stringing those boom sticks?

"A Yes. We were short-handed and had employed the Kings to do this work, which we agreed to pay them for. He was keeping his own time in the matter and inasmuch as Mr. Fisher wasn't there a great deal of the time, and it was impossible for me to be there except to check and see what had been done, we agreed to let them go ahead and do the work to speed things along, get the operation started. They had done quite a bit of falling and

bucking and were anxious to get the logs in the water. Instead of getting someone else to do it, told them to go ahead and we would pay them for it.

"Q   This would be work then of Huber & Fisher?

"A   Yes.

"Q   It wasn't a part of his logging contract?

"A   No, it wasn't.

\*    \*    \*    \*    \*

"Q   Was it the practice of Mr. King and his helpers to go over and work without either you or Mr. Fisher being present?

"A   Yes, because neither Fisher or myself were on the job continuously. We had to depend on that part of it. We had that agreement. That is why Mr. King was keeping the time on the work."

The plaintiff testified that her husband, with her assistance, kept records of the time which he and the other three men spent upon the work of constructing the pile driver and the log boom. She produced two sheets of those records and they became exhibits. One of the two is the December page of a 1953 calendar with some markings upon it. The other is a page of a common notebook containing entries of a bookkeeping character. The former became Exhibit B and the notebook sheet became Exhibit A. The witness swore that all of the entries on the two sheets were made by her husband with the exception of three which we will presently describe. Upon some of the numbers of the calendar page which designate days there appear penciled circles and X's, the meaning of which the witness was not permitted to mention. Upon each of the figures of the calendar page which designate December 2, 4, 7, 12, 14 and 16, her husband penciled the figure 4, and upon each of the numbers which designate December 10, 11 and 15 he penciled the figure 3. In the

spaces which represent December 10 and 11 he wrote, in addition to the penciled 3's, the words "Not Loren." In the space which represents December 15 he penciled, in addition to the figure 3, "Me ½." The entries which the plaintiff said she made appear in the places which designate December 7, 8 and 9. Over the figure 7 she wrote "F didn't wk", and testified that it meant "Fred didn't work." Fred, whoever he may be, is not involved in this proceeding. Under the figures 8 and 9, which represent December 8 and 9, she wrote "No wk." The witness swore that she made the entries upon her husband's direction. The following is a copy of Exhibit A:

"Huber & Fisher—Dec. 1953

Assemble & work on pile driver

| Dec 2—8 hrs. | Alton King | Henry King | Lyle King | Loren McWhorter |
|---|---|---|---|---|
| " 4—8 " | " | " | " | " |
| " 7—8 " | " | " | " | " |
| " 10—8 " | " | " | " | 0 |
| " 11—8 " | " | " | " | 0 |
| " 12—8 " | " | " | " | " |
| " 14—8 " | " | " | " | " |
| " 15—8 " | " | " | ½ | " |
| " 16—8 " | " | " | " | " |

17—Loren & John rafting hrs
18—Alton & John rafting   "

9 day 8 hrs at 2.00—16.00     $144.00
9 " " " " " — "     144.00
7 " " " " " — "     112.00
8½ " 8 " " 3.00—24.00     204.00

————
608.00"

It will be observed that the above computation is concerned in part with December 17 and 18. However,

those entries did not concern Lyle King and, hence, we will mention them no further.

The plaintiff testified that her husband compiled Exhibit A from the entries upon Exhibit B (the calendar page) and that he had prepared records in similar form in preceding months. She swore that monthly, after the computations were made and the sum due was paid, the sheets were discarded. We mentioned that in the space upon the calendar page which designates December 2 a small penciled 4 appears. Returning to Exhibit A it will be noticed that all of the four members of the crew were entered as having worked that day. Likewise, in the spaces on the calendar page which represent December 4 and 7 there appear small 4's. Exhibit A entered all four members of the crew as having worked on those two days. On December 8 and 9 the calendar page has an entry "No wk". Exhibit A omits those two days. In each of the spaces on the calendar page which represent December 10 and 11 there appear, as we have indicated, "Not Loren" and small penciled 3's. On Exhibit A ciphers were entered under the name of Loren McWhorter for December 10 and 11, but check marks under the names of the other three members of the crew. We turn now to December 15. Upon that day of the calendar page there appear the two entries "Me ½" and the numeral 3. On Exhibit A the fraction ½ was entered under the name of Lyle King and check marks under the names of the other three members of the crew. In the computation constituting the last of the entries on Exhibit A, all members of the crew were given credit for the time which the above entries showed they worked. Three of them were credited with $2.00 per hour, and one, being the member who had designated himself as "Me ½", was credited with $3.00 per hour.

.It is apparent from the above that the calendar sheet and the page torn from the notebook represented a crude but effective manner of keeping track of the men's time. It will be recalled that Huber testified:

"Mr. King was keeping the time on the work. * * * I paid them by the hour . . . paid at the rate of $2.00 an hour, such as that."

The above constitutes evidence that the work upon the pile driver and the log boom was not performed under the logging contract, but was rendered as employees of Huber & Fisher upon a basis of an hourly wage.

However, the mere fact that the work upon the log boom was separate from the contract for logging does not establish that on January 2, when death struck, King and the other three men intended to work upon the log boom. The defendant contends that it may be that at that time the men planned to go to the scene of the suspended logging operations and had no thought of working upon the log boom. Since the record indicates that a yarding engine which was a part of King's equipment required attention before logging could resume, the defendant argues that it may be that on January 2, when King entered the boat at Waldport, he intended to go to the yarding engine and prepare it for operation. In fact, the defendant argues that it is as probable that King intended to work on the yarding engine as upon the log boom. We shall now take note of evidence which was presented upon that score.

The plaintiff testified that in the evening before the fatality and in the morning immediately before her husband departed upon the trip which cost him his life, he told her that he had some more work to do upon the boom sticks and. that he would perform it that day

(January 2). Alma Monyer, plaintiff's daughter, and at the time of his death the wife of Loren McWhorter, testified that on January 2 immediately prior to the departure of her husband from their home in the company of her father, the latter declared that "they was going over to work on the boom sticks over there at Alsea Bay at Waldport." Dorothy King, widow of Henry King, testified that on the afternoon of Friday, January 1, King came to her home and, speaking to her husband, said:

"* * * let's go over and finish up the boom sticks and put the piling poles, or something * * * the piling or boom sticks or something * * * I can't remember the exact words but, anyway, that they be ready for their job Monday morning."

Homer Hull, a tree farmer, testified that on January 1, while he and King were discussing a venture which the two had under consideration, King told him that on the following day "he was going to Waldport in the morning" to "straighten the boom logs."

The above is a sufficient statement of the facts.

The appellant (Industrial Accident Commission) presents seventeen assignments of error. Before considering those which challenge the sufficiency of the evidence, we will give attention to others which contend that the circuit court admitted inadmissible evidence and gave to the jury erroneous instructions.

■ The fourth assignment of error is based upon a ruling which admitted into evidence Exhibit A (the sheet of paper which contained the computations). The objection to it was "irrelevant, immaterial." Counsel elucidated by adding:

"The last date shown on the record offered is under date of December 18, 1953. It's completely irrelevant in period of time to prove any point

in issue at the trial of this case. They have brought an action which took place some two weeks after that."

The fifth assignment of error, which we will consider concurrently with the fourth, is based upon a ruling which admitted into evidence Exhibit B (the calendar page and its entries). The objections to it were the same as those to A, with the following addition: "seems to be two different handwritings on the exhibit."

The defendant cites no statute or rule of evidence which it claims was violated when Exhibits A and B were received in evidence, with the exception of the rule against irrelevancy and ORS 41.280. The latter says:

"The party producing a writing as genuine which has been altered, or appears to have been altered, after its execution or making, in a part material to the question in dispute, shall account for the appearance or alteration. * * * If he does that, he may give the writing in evidence, but not otherwise."

It is true that Exhibits A and B were concerned with labor which was performed two weeks before the deceased lost his life, but the jury could have found that King was hired, not only for the period represented by A and B, but to perform in its entirety the job of constructing the log boom. That work was not complete when the drowning occurred. Exhibits A and B had a tendency to show that King was an employee, working for wages, and the jury could reasonably infer from the evidence that the relationship of employer and employee would have continued until the log boom was completed had death not intervened. The two papers were, therefore, material.

The plaintiff's notations upon Exhibit B, which are described in a preceding paragraph, were not alterations. Her uncontradicted testimony was that she made them under the direction of her husband as his assistant. They were original entries. Further, she fully explained them. The fourth and fifth assignments of error lack merit.

■ The sixth assignment of error combines within itself two rulings which were made during the reception of evidence. Each of the two denied a motion for mistrial. The plaintiff's first witness was herself. After she had stated that her husband "had done bucking and falling and yarding for Huber & Fisher," she was asked: "You said he did have a contract to fall and buck and yard?" and replied, "He had a verbal contract." Presently the defendant was granted the privilege of inquiring of the witness concerning her knowledge of the relationship between her husband and Huber & Fisher. Defendant then asked her: "Mrs. King, were you ever present at any time when Mr. Huber or Mr. Fisher and your husband made the contract that you stated they made?" The answer was "No, I was not." In reply to another question, the witness granted that her only knowledge of the relationship was "hearsay." At that point, defendant moved that "the witness' testimony in regard to the contract be stricken."

It will be noticed that before the motion was made, the word "contract" had been uttered four times, twice by defendant's counsel, once by plaintiff's counsel, and once by the plaintiff herself. But, in all four instances, it was used in connection with King's work of logging, and not to characterize the arrangement under which the pile driver and the log boom were constructed. We understand that the defendant agrees

that King performed his logging operations under some form of compact whereby he became an employer. Before a ruling was made upon defendant's motion, colloquy occurred in which plaintiff's counsel expressed a desire to show, through records, that the work upon the boom sticks was not performed as a part of the logging undertaking. The trial judge interrupted the colloquy by declaring, ''If she has no knowledge she can't testify about a contract that she has no knowledge of.'' Shortly he terminated the discussion by ruling, ''Well, let the objection be sustained. I think it's a proper objection.'' Then defendant's counsel was granted a further privilege of asking the witness some questions. He asked: ''Mrs. King, were you ever at the operation on the other side of the bay?'' and she answered ''No, I was not.'' At that point, defendant moved, ''I move that all of the testimony offered by the plaintiff's witness at this time be stricken as irrelevant and hearsay.'' The motion was sustained. Thereupon plaintiff's counsel announced a purpose to inquire of his client whether she ''helped him and was she doing any bookkeeping in connection with his work.'' The court, in granting the request, added, ''There is no contract in evidence yet or any evidence of a contract.'' Presently the examination centered in the circles and X's that appear upon Exhibit B. Plaintiff's counsel then asked, ''So you have no idea of what the circles on the calendar did mean?'' She replied, ''Not unless they meant that they were just working * * *.'' Thereupon defendant's counsel declared, ''I object. I move for a mistrial.'' The ruling was, ''I will strike that and withdraw it from the consideration of this jury.'' As the examination proceeded, plaintiff's attorney asked, ''For the months of October and November, did you know how the men

were paid —''. An objection, on the ground of irrelevancy, was sustained by a ruling which asked plaintiff's counsel, ''What do you claim for back in October and November?'' Colloquy again occurred, in the course of which plaintiff's counsel said, ''We admit, Your Honor, that under this contract Lyle King was paid —''. At that juncture defendant stated, ''I object to this continual reference to a contract, Your Honor, and I move for a mistrial.'' The motion was denied, whereupon the court and counsel went into chambers. After they had returned to the courtroom, plaintiff's counsel asked his client, ''Did you make or did you and your husband make checks payable to these other three men during the latter half of October and during the month of November?'' Defendant's objection on the ground of irrelevancy was overruled, with an admonition that plaintiff would have to show that the fact which she sought to elicit had some connection with the incident of January 2. At that point, defendant's counsel said, ''May it please the Court, the defendant would like the record to show also that defendant is moving for a mistrial in the event that there is no connecting up because of the fact that once the bell is rung you cannot unring it.'' The ruling was, ''I can't consider a motion for a mistrial in the future.''

Although we have read and reread the testimony concerning the above incidents, we found nothing that indicates that the plaintiff was seeking to get before the jury any inadmissible testimony, or was attempting to prejudice the jury against the defendant by an improper utterance. The plaintiff's unsuccessful efforts to say that the logging was done under a contract could not have prejudiced the defendant, for the latter itself asserted that the logging was performed by the defendant as an employer. Far from contending that

the construction work upon the pile driver and log boom was performed under a contract, the plaintiff apparently wished to testify that it was done by her husband as an employee. But the objections of counsel for the defendant, who was thoroughly alert, and the emphatic rulings of the trial judge prevented the plaintiff from saying anything upon that subject. In fact, the rulings struck from the record some testimony which possibly should have been permitted to remain.

It is our belief that the motions for mistrial were properly denied. This assignment of error is without merit.

■ The seventh assignment of error challenges rulings which permitted Mrs. Monyer, Mrs. Dorothy King and the plaintiff to give the testimony summarized in a preceding paragraph in which each testified that shortly before King departed upon the trip which took his life he told them that he intended to cross the bay and complete the log boom. The eighth assignment of error is based upon a similar ruling concerning Homer Hull, who also testified that King had told him of his intention to cross the bay and finish the log boom.

The principal attack upon the rulings which permitted those witnesses to testify is that the testimony which they gave was hearsay.

In *State v. Farnam*, 82 Or 211, 161 P 417, Ann Cas 1918A 318 (homicide of a woman seduced), one of the principal questions was the identity of charred remains found in the ashes of a barn which had burned to the ground. The state wished to prove that the decedent, Edna Morgan, had gone to the barn with the defendant. The decision held that the state was entitled to show that on the day prior to the homicide she had said she could not go home with some girl friends who were

present because the defendant was coming to see her. We quote from the decision:

"If the doing of an act is a material question, then the existence of a design or plan to do that specific act is relevant to show that the act was probably done (1 Wigmore, Ev., § 102); and, considering the plan or design as a condition of the mind, a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances dispelling suspicion and containing no suggestion of sinister motives, only reflect the mental state, and therefore are competent to prove the condition of the mind, or, in other words, the plan or design."

The decision added:

"The declaration of Edna Morgan was made in a perfectly natural manner, and there is nowhere in the record any intimation that it was made otherwise. The whereabouts of Edna Morgan was a material issue. It was important to know what she did and where she went. The state contended that she met the defendant and accompanied him to the Beamer barn. Evidence of her declaration was competent to show what was in her mind, and that what she intended to do was probably done: State v. Mortensen, 26 Utah, 312 (73 Pac. 562, 633). The language used by her was only one way of stating that she intended to meet Roy Farnam, * * *."

*McKinnon v. Chenoweth,* 176 Or 74, 155 P2d 944, was based upon charges that the defendant had alienated the affections of plaintiff's wife. It held admissible a declaration made by the wife during the crucial period that she was on her way to a hotel to see a friend. The defendant at that time was registered at that hotel, and the plaintiff claimed that a clandestine meeting was planned. The declarant (wife) was living when the testimony was presented. The decision

cited *State v. Farnam,* supra, and Wigmore on Evidence, 3d Ed, § 1725. The latter mentions with approval the Farnam decision, and the pocket part refers approvingly to the McKinnon opinion. Wigmore (§ 1725) declares:

> "* * * as a condition of mind, the plan or design, may also, it is clear, be evidenced under the present Exception by the *person's own statements* as to its existence."

The text explains:

> "The use of such statements of design or plan is illustrated in a variety of precedents."

and adds:

> "In most of the precedents, the issue involves the conduct of a *victim of a crime,* or of an *insured person,* or of a *sufferer from an injury.* But the principle has no narrow limitations; for example, * * * *"

McCormick on Evidence, p 572, after setting forth an enlightening analysis of the rule, says:

> "* * * Nevertheless, the modern cases and texts leave no room to doubt the statement that the accepted principle today is that evidence of declarations of a plan, design or intention presently entertained by the declarant is, subject to the usual limitations as to remoteness in time and apparent sincerity common to all declarations of mental state, admissible when offered as evidence that the design was carried out by acts or omissions of the declarant."

■ The defendant depends upon *Pratt v. State Industrial Accident Commission,* 201 Or 658, 271 P2d 659, and *Shepard v. Purvine,* 196 Or 348, 248 P2d 352, to sustain a contention which it makes that the rule employed in the Farnam and McKinnon decisions was

abrogated by ORS 41.840, 41.850 and 41.900(4). The first of those sections, briefly stated, renders admissible the declaration of a deceased member of a family upon issues of pedigree. The first sentence of 41.850 renders admissible against a successor in interest the declarations against pecuniary interest made by his predecessor. The second sentence deems admissible self-serving declarations of a deceased if the proceeding is by or against an estate's representative and if the party has appeared as a witness in his own behalf or has offered statements made by the deceased against his interest. The part of 41.900, upon which the defendant relies, renders admissible (a) the declaration of a deceased in respect to relationship, birth, marriage or death of any person related by blood or marriage to the decedent; (b) the declaration of a deceased against his interest in respect to his real property; and (c) the declaration of a dying person made under a sense of impending death concerning the cause of death. It is clear that none of those sections have any bearing upon the statements attributed to King that are under analysis.

All of the code sections which the defendant cited were a part of our laws in their present form when the Farnam and McKinnon decisions were written. The majority opinion in the Farnam case expressly referred to the section which is now ORS 41.900(4). The dissenting opinion quoted it. The majority opinion said:

"* * * The rule making the statement of Edna Morgan admissible does not contravene any section of the Code. If, as held by most courts, the *res gestae* doctrine is the basis of the rule admitting the declaration, then it is expressly sanctioned by the Code; or if the rule is founded on the idea that the utterance is a verbal act, a notion entertained by a few courts, then, strictly speaking,

the evidence is not hearsay; or if, as the writer thinks, the true theory of the rule is that the statement of the deceased is original evidence of her intention, which the jury can consider as a circumstance indicating that she probably did what she intended to do, then on that theory no section of the Code is transgressed."

*Shepard v. Purvine,* supra, was based upon an averment that one C. M. Purvine, whose death preceded the filing of the suit, had granted the plaintiffs an easement to take water from a spring upon Purvine's farm and transmit it by pipeline to the plaintiffs' property. The defendants were the sole heirs at law of the deceased. They conceded that their father had granted the plaintiffs the privilege to take water, but claimed that the right granted was temporary only. In order to establish their contention, they presented declarations upon the subject which, they swore, the deceased had made. The purported declarations were received without objection. The decision described them as "obviously self-serving." Even though received without objection, this court considered their admissibility, and in so doing stated:

"Testimony respecting declarations made during his lifetime by a deceased person is admissible only in certain cases: * * *."

Following that statement, the decision summarized the several sections of our laws which are mentioned in a preceding paragraph. After the summary had been made, the decision continued:

"The testimony respecting the statements attributed to the deceased did not come within any of these exceptions to the hearsay rule."

Since the declarations were received without objection, the decision considered them in the same manner as the other evidence.

*Pratt v. State Industrial Accident Commission,*
supra, was an action by a widow, pursuant to the
Workmen's Compensation Act, to recover compensa-
tion benefits under averments that her husband lost
his life through an accident arising out of and in the
course of his employment. The circuit court held the
evidence insufficient to prove the charge. Our de-
cision found that the sole evidence, indicating that the
deceased sustained injury by accident arising out of
and in the course of employment, consisted of casual
statements made by him that he was injured when a
slab of stone fell upon his foot while he was engaged
in his labors. In holding the declarations inadmissible,
our decision, referring to *Shepard v. Purvine,* supra,
said:

> "* * * In the Shepard case this court, speak-
> ing through Mr. Justice Tooze, summarized in the
> following words the limited occasions and circum-
> stances under which the declarations of a decedent
> are admissible."

At that point the decision quoted from the Shepard
opinion the part concerning the code sections which are
now ORS 41.840, 41.850 and 41.900(4).

As we have said, the defendant contends that the
Pratt and Shepard decisions constitute holdings that
the rule in the Farnam and the McKinnon decisions
was abrogated by ORS 41.840, 41.850 and 41.900(4).
It is apparent from one of the quotations which we
made from the Farnam decision that the rule employed
in it is embraced by the rules of evidence which were
codified in this state in 1866. As to the codification,
see Deady's General Laws of Oregon (1845-1864),
footnote p 315.

A reading of *State v. Farnam* indicates that before
this court adopted the rule that declarations of intent,

design or plan made by one who, it is claimed, later carried his purpose into execution, it bestowed exhaustive attention upon the problem. Since that time, as is shown by the sections of Wigmore and McCormick to which we have referred, many decisions by other courts have employed the same rule. Clearly, the Shepard and Pratt pronouncements did not intend to overrule the Farnam and McKinnon decisions nor to discard the rule they employed. Possibly the Shepard and Pratt opinions were remiss in overlooking the fact that the rules governing the admissibility of a deceased's declarations are broader than the sections of our laws which they cited. We are satisfied that the rule employed in the Farnam and McKinnon decisions is sound and adhere to it. We conclude that the trial judge did not err when he overruled the aforementioned objections made by the defendant. We add that the evidence indicates that the declarations were made in a natural manner and that no one claims they were attended by suspicious or discrediting circumstances.

The seventh and eighth assignments of error are dismissed for lack of merit.

We now consider the ninth assignment of error. It challenges rulings which permitted the plaintiff to read to the jury testimony which was given December 13, 1954, by the aforementioned Lawrence C. Huber before an assistant commissioner of the Industrial Accident Commission while that agency was considering the plaintiff's claim. The hearing was conducted pursuant to ORS 656.282, which empowers the commission to "hear and determine all questions within its jurisdiction." The record terms the hearing a "rehearing" but we will refer to it as a hearing. When Huber testified before the assistant commissioner he

was under oath. He was first examined by plaintiff's counsel and was then cross-examined by the assistant commissioner. An employee of the commission, who identified herself as "hearing reporter," made a shorthand record of the testimony and later transcribed it. In the circuit court, counsel for the defendant, in referring to the transcribed testimony, said: "I agree to stipulate with Mr. Richards that this was the true transcript of the testimony." The record shows that Mr. Huber was in British Columbia and, therefore, outside this jurisdiction at the time of the trial. The only parts of Mr. Huber's testimony which the plaintiff did not offer to read were those which she assumed were vulnerable to valid objections. The defendant made no request that they be read.

ORS 41.900 provides:

"Evidence may be given of the following facts:
*   *   *

"(8) The testimony of a witness, deceased, or out of the state, or unable to testify, given in a former action, suit, or proceeding, or trial thereof, between the same parties, relating to the same matter."

The defendant challenged the ruling which permitted the plaintiff to read Mr. Huber's testimony by objecting: (1) "No foundation laid here to this being in the form of a deposition. There is no foundation laid here that the reporter taking these reports was an official court reporter"; (2) "The defendant objects to the introduction of this testimony at this time as not being in compliance with the provisions of ORS 41.900, subsection 8, as the rehearing not qualifying as a proceeding as intended by the statute."

Other objections were voiced in the circuit court,

but we do not interpret the assignment of error under consideration as submitting them.

The defendant's first attack upon the testimony which Huber gave before the assistant commissioner points out that it is not "in the form of a deposition", and adds that it was not certified by "an official court reporter."

■ The plaintiff makes no claim that the testimony given by Huber before the assistant commissioner, as transcribed by the "hearing reporter", is a deposition. It was presented as former testimony under the provisions of ORS 41.900(8). Former testimony, if it was given (a) "in a former action, suit or proceeding" and "between the same parties"; (b) by a witness who has since died, is "out of the state or unable to testify" may be used in a later trial. The admissibility in the later trial is not dependent upon whether or not a reporter, official or otherwise, attended the former proceeding. McCormick on Evidence, § 237; 31 CJS, Evidence, § 401, p 1208; 20 Am Jur, Evidence, § 710, p 595. However, ORS 8.360 offers a simple means of proving former testimony if it was reported by an official reporter.

■ The defendant next contends that the hearing which the Industrial Accident Commission conducted through its assistant commissioner December 13, 1954, was not a "proceeding" within the contemplation of ORS 41.900(8). The extensive use of administrative agencies, such as the Industrial Accident Commission, as quasi-judicial bodies is an important feature today in the administration of justice. Generally, the courts attach to the findings of such agencies the effect of a verdict by a jury, but ORS 656.288 requires that appeals to the circuit court from the orders of the defendant shall be tried de novo.

The word "proceeding" which occurs in ORS 41.900(8) has a broad ambit, and its meaning in any given situation in which it was employed must be determined "according to the context and the subject to which it relates." *Fish v. Bishop,* 176 Or 210, 156 P2d 204. McCormick on Evidence, § 235, says:

"If the accepted requirements of the administration of the oath, adequate opportunity to cross-examine on substantially the same issue, and present unavailability of the witness, are satisfied then the character of the tribunal whether judicial, legislative, or administrative, and the form of the proceedings are immaterial, and the former testimony should be received. Accordingly, when these conditions are met, testimony taken before arbitrators, or before a committing magistrate at a preliminary hearing, or in a sworn examination before the Comptroller by the Corporation Counsel of a person asserting a claim against a city, has been held admissible."

See, to like effect, Wigmore on Evidence, 3d Ed, § 1373.

The following is taken from 31 CJS, Evidence, § 386, p 1192:

"The fact that the evidence was originally given before a subordinate court is not usually regarded as an objection to its reception. Testimony given before referees, quasi judicial tribunals, and magistrates as arbitrators has been received."

*Federal Rubber Co. v. Industrial Commission,* 185 Wis 299, 201 NW 261, 40 ALR 491, ruled:

"* * * The enforcement of a claim under the Workmen's Compensation Act is certainly a proceeding coming well within the title of chapter 330, relating to limitations of actions."

*Industrial Commission of Ohio v. Glick,* 49 Ohio App 415, 197 NE 372, stated:

> "The sole question presented by the proceeding in error involves the admissibility of the testimony of a deceased witness, who testified at the initial hearing before a referee appointed by the Industrial Commission."

The testimony of the witness was offered by the plaintiff and, over the objection of the appellant, was admitted. Without the evidence there would have been no proof of the cause of the injury. In holding that no error was committed when the trial judge received the testimony, the court ruled: "The referee acts in a dual capacity as a *pseudo* judge and as a representative of the Commission."

The following is taken from *Heil v. Big Horn Construction Co.,* 65 Wyo 175, 197 P2d 692:

> "Does an application for compensation under the Workmen's Compensation law of Wyoming result in a pending 'proceeding' within the provisions of Section 16-404 supra? We are inclined to affirm that it does. We are not without authority on the point. In Industrial Commission of Ohio vs. Vail, 110 Oh. St. 304, 143 N.E. 716, the Supreme Court of Ohio decided that:
>
> " 'An application for compensation under the Workmen's Compensation Law (Gen. Code, §§ 1465-37 to 1465-108) filed with the Industrial Commission of Ohio prior to August 16, 1921, the date the amendment to section 1465-90, General Code, became effective, is a proceeding, within the provisions of section 26, General Code, which ripens into an action upon an appeal from a denial of such claim by the Industrial Commission, and the amendment is not applicable in the trial of such action.' "

We think that the authorities of which we took note correctly interpreted the meaning of the word "pro-

ceeding" and that the latter as it occurs in ORS
41.900(8) includes a hearing conducted by a quasi judi-
cial officer, provided he had jurisdiction over the sub-
ject matter of the hearing and provided further that,
pursuant to authority vested in him, he permitted ade-
quate cross-examination.

We conclude that the ninth assignment of error dis-
closes no merit.

The tenth, eleventh, twelfth, thirteenth and seven-
teenth assignments of error are not accompanied with
any argument or citation to authority. We considered
each of them but found no merit. We deem it unneces-
sary to set forth a statement of our reasons. We dis-
miss them as lacking in merit.

■ The fourteenth assignment of error is based upon
a contention that the trial judge should have given to
the jury the following requested instruction: "The
State Industrial Accident Commission is not in any
sense a party adverse to plaintiff. The fund in its
hands for disbursement is a trust fund and it must be
disbursed only according to law." None of the state's
agencies is "a party adverse" to anyone who enters
its office on agency business, but we do not believe
that the jury would have been better equipped to de-
cide the issues submitted to it had the requested in-
struction been given. We dismiss this assignment of
error as lacking in merit.

The fifteenth assignment of error is based upon
an instruction which was given to the jury. It is chal-
lenged by the following exception: "* * * it was a
clear comment on the evidence by the Court." We
think the exception lacks merit.

The sixteenth assignment of error, likewise, is
based upon an instruction given to the jury. The ex-
ception to it was expressed in these words: "The

instruction was completely irrelevant and highly prejudicial." We do not believe that the exception was warranted. We dismiss the fifteenth and sixteenth assignments of error as lacking in merit.

■ The first assignment of error is based upon a ruling which denied the defendant's motion for an order of involuntary nonsuit; the second upon a ruling which denied an order for a directed verdict; and the third complains because the court declined to enter judgment in favor of the defendant notwithstanding the verdict.

In preceding paragraphs we set forth a review of the evidence. The motions to which we have just referred were based in part upon contentions that (1) Lyle King was an employer and not an employee; (2) the record contains no proof that King was endeavoring at the time of his death to cross the bay to the place where the incomplete log boom was moored; and (3) if King was heading for the log boom, his drowning would not entitle the plaintiff to compensation.

Without again analyzing the testimony, we express our belief that it warranted a finding that the construction of the log boom was performed by King as an employee and that at the time of his death he was on his way to resume work upon that object. The defendant, it is conceded, awarded compensation for the death of King's son, his brother, and his son-in-law, all three of whom were in the same small boat that King occupied when death struck. Those three individuals were embarked upon the same journey as King, and there is no reason for believing that their objective was different from his. The award of compensation for the death of those three men constituted the holding by the commission that they lost their lives in an accident which arose out of and in the course

of their employment. The holding was justified by authorities, such as Horovitz, Current Trends in Workmen's Compensation, p 671; 1 Larson, Workmen's Compensation Law, § 15.11; *Cudahy Packing Co. v. Parramore,* 263 US 418, 68 L Ed 366, 44 S Ct 153, 30 ALR 532; *Lamm v. Silver Falls Timber Co.,* 133 Or 468, 277 P 91, 286 P 527, 291 P 375; *Kowcun v. Bybee,* 182 Or 271, 186 P2d 790; and *Freire v. Matson Navigation Co.,* 19 Cal 2d 8, 118 P2d 809. We conclude that this assignment of error lacks merit.

The above disposes of all assignments of error. We have not mentioned herein some of the numerous authorities cited by the parties, but all received careful attention.

Since we have found no error, the judgment of the circuit court is affirmed.

**ON REHEARING**

ON REHEARING

Joe B. Richards and Luvaas & Cobb, Eugene, for respondent.

Robert Y. Thornton, Attorney General, and Earl M. Preston and Ray H. Lafky, Assistant Attorneys General, Salem, for appellant.

ROSSMAN, J.

The petition for a rehearing filed by the appellant, State Industrial Accident Commission, contends:

"The Court erred in finding that the decedent met his death by injury arising out of and in the course of his employment while enroute to work.

"The Court decision recites:

'Without again analyzing the testimony, we express our belief that it warranted a finding that the construction of the log boom was performed by King as an employee and that at the

time of his death he was on his way to resume work upon that object.'

The decedent workman was not at work. He was 'on his way to work.' He was in his own conveyance. He was not being paid either for use of the conveyance or his time in going to and from work. He was not on the employer's premises.

"The Commission had allowed the claims of the other three on the theory that they were in King's boat, King was the employer and the transportation was part of the contract of employment with King.

"When viewed in the light that King and the other three were employes of Huber & Fisher there were none of the travel time tests such as employer's conveyance, employer's premises, pay for travel time or pay for transportation."

The petition challenges our opinion in no other detail. No brief accompanied it.

■ Unless we misinterpret the petition for a rehearing, it is based upon a fear that, in sustaining the award of compensation decreed by the circuit court, we acted upon a belief that a workman, who sustains an injury while on his way to his employer's premises but before he arrives there, is entitled to an award of compensation even though he can point to no special circumstances affecting his situation. We acted under no belief of that kind. This court has more than once recognized that under our Workmen's Compensation Act only those are entitled to compensation who are the victims of an accident which arose out of and in the course of their employment. One who can say nothing more for himself than that he was on his way to his employer's premises when injury befell him does not bring himself within the terms of the act. *Hopkins v. State Industrial Commission*, 160 Or 95, 83 P2d 487, and *March v. State Industrial Commission*, 142

Or 246, 20 P2d 227. In our previous opinion we pointed out that King's death occurred while he and his three fellow workmen were crossing Alsea Bay in a boat which King owned and which

> "would have been necessary to their work of stringing the log sticks * * *. The trip across the bay, two miles in length, was the only means by which the group could have reached the boom which they were constructing."

It was under those and some ancillary circumstances that we reached the conclusion and employed the words which the petition for a rehearing criticizes. We will now reconsider the question as to whether or not those circumstances warranted the award which the circuit court decreed.

Unless resort is had again to the record, the words which we quoted from the petition for a rehearing may mislead. One of the utterances is this: "He was in his own conveyance. He was not being paid either for use of the conveyance or his time in going to and from work." The following statement contained in our previous opinion is not challenged by the petition for a rehearing: "The boat which King possessed would have been necessary to their work of stringing the log sticks." All four men were in the boat when fate struck. It is true that King owned the boat in which he and his three fellow workmen were crossing the bay, but the boat was essential to the work which they proposed to do. All four would have used the boat. Its relation to the work that the men were doing was similar to that of the pile driver. It was an implement or device which was essential to the prosecution of the work. The statement, "He was not being paid either for use of the conveyance or his time in going to and from work" is not supported by the record. According

to Schneider, Workmens Compensation Text, Perm Ed, § 1751:

> "And it has been held that a contract to furnish an employee with necessary transportation 'may be implied from the acts of the employer who tacitly permits his employees to ride to and from work on a conveyance used for some purpose in connection with the business in which he is engaged'."

Before going on to the issue to which we will devote most of our attention, we will take note of some evidence concerning the boat. The decedent [King] owned the boat in which the men were crossing the bay when death struck. But his employers, Huber & Fisher, had a small tugboat which the men could have used had they so wished. The tugboat was available to them the morning of the fatality. L. C. Huber, of the firm just mentioned, in referring to the boat and the four workmen, testified:

"Q  Did you have your tug tied up to the dock that the Kings used?

"A  No. The tugboat was tied up river. It was docked at—

"Q  Well, it wasn't at the same location?

"A  No, not the same location. However, they did have access to it.

"Q  Would King and his men have been free to have used the tug on the date of the accident?

"A  Oh, yes.

"Q  They could have used it?

"A  Yes.

"Q  It would have been much safer transportation?

"A  Oh, yes. The accident wouldn't have happened. However, they were conscientious fellows. We gave them free use of the tugboat any time they wanted it for that matter. But he was a little bit concerned about doing damage to it or one thing or

another. It was expensive and they decided to use their own boat."

An individual, by the name of Victor Quist, whose vocation was fishing and salvaging logs, was frequently at the dock when King and the other three men left to cross the bay. According to him, the men sometimes used King's boat and "They used many times Huber's tug." By "Huber's" he meant the boat belonging to Huber & Fisher. The following is also taken from his testimony:

"Q But you did know that they rode across on that tug?
"A Yes.

&ast; &ast; &ast;

"Q You stated that you saw the Kings, as you knew them—the group, the four—on occasions would ride on the tug over to the scene of this operation?
"A Yes."

No one questions any of the above testimony. Quist also swore that he was familiar with the manner in which boom sticks are fashioned into log booms. After describing the size of boom sticks and the manner in which the end of one is fastened to the end of another by chains so as to make a continuous string, he pointed out that in the construction of a log boom a boat is necessary; for example:

"Q Do you know whether or not in placing them a boat is used?
"A Yes, a boat is used.

"Q Can't be done on foot by standing in the water?
"A No."

The record contains no testimony to the contrary. The water at high tide in the area where the men worked was twenty feet deep.

Two of those who testified went to the site of the incomplete log boom the day after the disaster and, in response to questions, described what they found there: logs, pile driver, boom sticks, the unfinished log boom, etc. They mentioned no boat.

In view of the fact that two boats were available to the men and they chose King's, the smaller, it seems permissible to infer that they must have believed that for the work to be done that day the smaller would be the more useful. The boat, as we have seen, served a dual purpose. Since one was essential to the work underway, it appears reasonable to believe that the men were under an implied duty to take King's boat, if they rejected the employers'. It would have been impossible for the men to reach the place of their employment that morning without a boat and, likewise, it would have been impossible for them to have performed their work without one.

We come now to the issue as to whether or not the deceased, King, came to his death "by accident arising out of and in the course of his employment." The quoted words were taken from ORS 656.152.

Larson's Workmen's Compensation Law, § 18.24, speaks of "carrying employment impedimenta to and from work." The treatise gives attention to *Gelbart v. New Jersey Egg Producers Assn.*, 17 NJ Misc R 185, 7 A2d 636, in which the deceased workman, for whose death compensation was sought, was entrusted by his employer with the keys to the plant and was required each morning to open the doors. Upon the morning of the fatality he was on his way to the plant, with the keys in his pocket, when a motor vehicle collision took

his life. Compensation was ordered by a decision, which said:

"It is a reasonable inference and I find as facts: That the custody of the keys by the decedent in the instant case was an act obviously beneficial to the employer; that the accident occurred while he was traversing the direct route from his home to respondent's place of business &ast; &ast; &ast;; and that in the procuring of the keys entrusted to his care and custody, he was performing an act incidental to his employment and for the benefit of his employer; that the accident occurred at a time when he was performing duties within the course of his employment; and that the accident arose out of and in the course of such employment and within the construction of the statute of this state as annunciated by the decisions of this and the other Courts of this State; &ast; &ast; &ast;."

In *Davis v Bjorenson,* 229 Ia 7, 293 NW 829, the item of "impedimenta" was an automobile which the workman [claimant] owned and which was used as a service car in his employer's business. The employer sold and serviced farming implements. The claimant was the serviceman. He was injured while driving from his home to his employer's shop, and his claim for compensation precipitated the case under review. According to the decision, the claimant's duties consisted of inside shop and outside service calls. The latter required transportation. In making the calls, he used his car. His employer supplied the oil and gasoline. We quote from the decision:

"&ast; &ast; &ast; These calls were made from the shop in the daytime and from claimant's home at other times upon call by the employer to claimant at his home. Under the employment agreement claimant regularly furnished his automobile to the employer for use in the business as a service car. At night

the car was kept at claimant's home where he was subject to emergency service calls requiring its use. During regular working hours the car was kept at the employer's place of business, for use in the business, not only by claimant, but also by the employer and by other employees. Thus the car was an instrumentality of the business at all hours of the day and was subject to that use at night. It happened that claimant received no orders to make emergency service calls during the night before he was injured. Consequently it was his duty and this duty was regular and definite, to take the automobile to the employer's shop for its use in the business, by others as well as claimant. In so doing he was performing for his employer a substantial service required by his employment at the place and in the manner so required. In the language of the able trial court, 'Claimant had no selection of his mode of travel to work, that he was required under the terms of his contract to drive his own car from his home to the shop where it was available to his employer for use in the employer's business.' "

The court held that the claimant was in the course of his employment when so engaged, and that his injury arose out of his employment.

In *Jones v. Texas Indemnity Insurance Co.* (Tex Civ App), 223 SW2d 286, the injured workman who sought compensation was a serviceman in the employ of the local store of Montgomery Ward & Company. He supplied his own automobile and repaired household equipment such as radios, refrigerators and washing machines. Like all other employees, he daily worked in his employer's store. He was also subject to call at other times. He was paid a salary of $48 per week, together with an allowance of five cents per mile for the use of his automobile. He was injured while driving to his employer's store to begin his day's

work, and thereupon sought compensation. In holding in his favor, the court said:

"In the case we have here the employee Jones was at the time of his injury engaged in the performance of the duty of his employment. He was doing what his contract of employment either expressly authorized him to do or required him to do. He was driving the automobile from a place he had taken same in the authorized prosecution of his employer's business to be further used in the prosecution of that business at another place.   *   *   *

*   *   *

"In our opinion the evidence clearly raised the issue that the duties of the employment of Jones required him to drive on the public roads; that when he was injured he was returning the automobile in question to his employer's place of business; that he was transporting his employer's equipment and tools under its express and implied direction, for use in its business."

The court held that the injury arose out of and in the course of the employment.

In *Driscoll Construction Co. v. Industrial Commission of Colorado,* 94 Colo 568, 31 P2d 491, the impedimenta were two horses which the injured workman owned and which he was taking to the place where he was employed in road construction. Had he reached the place, he would have hitched the team to one of his employer's drag scrapers and would then have proceeded with his work. The employer made no provision for stabling the horses and, therefore, this workman, whose name was Erker, like some of the others stabled his team a half mile distant. On the morning of the accident, Erker harnessed his team to a wagon and started driving to the construction work. On the way the wagon overturned and he was injured. The assign-

ment of error presented the contention that the accident did not arise out of and in the course of the employment. It was argued that, since Erker had not yet hitched his team to the scraper, the injury occurred while he was "enroute to his work" but had not yet entered the field of actual operation. In rejecting the contention and sustaining the award of compensation, the court pointed out:

> "* * * But it was necessary for Erker to bring his own horses. Traveling by wagon as he did was a natural, and as the evidence shows the customary, way of getting the team upon the ground, as the terms of his employment required him to do."

In *Barkman v. Meyer*, 12 NJ Misc 287, 171 A 536, the impedimenta were two dairy pails which the workman was carrying back to the farm when an automobile ran him down upon the public road and took his life. The workman was a dairyman on his employer's farm. His work began at half past four in the morning and at seven o'clock, after milking the cows and doing farm work, he went for breakfast to his home, a half mile beyond the employer's property. Each morning he took home with him, as part of his employment, some dairy pails to be washed and cleaned at his home. He returned the pails to the farm after he had eaten his breakfast. The washing and cleaning of the milk pails at home, whether done by the workman or his wife, was an essential part of the duty which he performed for his employer. In sustaining the workman's right to compensation, the court said:

> "* * * and since he was thus obliged to carry these pails to his home, the deceased was necessarily engaged in the service of his employer in both going home and coming back, * * *.
> * * *

"Under the Workmen's Compensation Act * * * a workingman is not required to be physically engaged in actual labor for his employer in order to come within the provisions of the act, * * *; the courts have held it to be sufficient if, as in this case, he was in the service of his employer; * * *."

The bitterly contested case of *O. P. Skaggs Co. v. Nixon,* 101 Colo 203, 72 P2d 1102, is enlightening. Nixon was an attorney whose office was located in Greeley. The Skaggs Company maintained its office in Denver. Nixon was employed by the Skaggs Company to render legal services and also to perform some others of an executive nature, for both of which he was paid $50 per month. Under the terms of his employment, he was required to go to Denver when requested without additional compensation or expense to the Skaggs Company. On the occasion which preceded the case under review, Nixon had been called to the office of O. P. Skaggs, president of the company, in Denver, and was given some papers upon which he was requested to prepare an opinion. While returning to Greeley, with the papers in his possession, the automobile accident occurred which resulted in Nixon's claim for compensation. In sustaining the claim, the court said:

"While it was not specified that he should go by automobile, under modern conditions his doing so was the adoption of a reasonable mode of transportation."

The court held:

"We are of the opinion that the accident arose out of and in the course of claimant's employment."

We shall review cases of the foregoing kind no further, except to mention *Driessen v. Schiefelbein,* 67 SD 645, 297 NW 685, which is readily distinguishable

from the one at bar, but we notice that the court in deciding it stated:

"In the case of Stratton v. Interstate Fruit Company, 47 S. D. 452, 199 N. W. 117, the injury occurred while a truck driver was returning to his work from dinner, but the facts in that case established that this driver was actually performing a duty owed the employer, in that, at the time of the accident he had on his truck certain property which it was his duty to collect and return to his place of employment."

As we have seen, the unchallenged evidence shows that a boat was essential to the work of constructing the log boom. It is true that the record does not expressly indicate that the employers had not provided for the men a boat on the other side of the bay. But, after the plaintiff had presented the evidence above reviewed showing that (a) the men needed a boat to perform the work which they planned that day; (b) two boats were available to them, King's and the employers'; and (c) witnesses who had crossed the bay the day after the fatality and who, in response to questions as to what they saw there, had mentioned no boat, the defendant [accident commission] made no effort to show that a boat, other than the two which we have mentioned was available to the men. We think that the only reasonable conclusion which can be drawn from the situation is that the boat in which the men proposed to cross the bay was the one which they proposed to use in working upon the log boom. In other words, they were bringing with them to the scene of their labors equipment [the boat] essential to the work which they were hired to perform. This, therefore, is a case in which the means of transportation was also an essential tool or instrument of the toil. We have taken note of the fact that the men could not reach the site

of their work without the boat and that they could not perform their work without the boat.

Larson, in his mention of cases in which the workman was "carrying impedimenta to and from work," says:

> "The mere fact that claimant is, while going to work, also carrying with him some of the paraphernalia of his employment does not, in itself, convert the trip into a part of the employment."

We think that that observation is warranted, and will now trace its application through some of the cases which we have reviewed.

In the Gelbart case, the fact that the workman had in his possession the keys to the plant when death struck did not alone induce the court to hold that the accident arose out of and in the course of the employment. In reporting the facts of the case, the court stated that Gelbart was subject to call at all hours, although it did not mention that fact in the part of the opinion which reflects its reasoning. As we have seen, the court pointed out, "The custody of the keys by the decedent in the instant case was an act obviously beneficial to the employer." In that case, the employer was under no duty, express or implied, to furnish Gelbart with transportation.

Nixon, in the O. P. Skaggs Company case, likewise, was subject to call at all hours and, like Gelbart, was not entitled to transportation as an incident of his employment. However, his transportation of the valuable papers belonging to his employer was beneficial to the latter and was made in the performance of his duties. The workman, in *Davis v. Bjorenson*, was also subject to call at all hours. His driving the car to his employer's shop was deemed by the court beneficial to the

employer. In the Driscoll Construction Company case, the workman, like King, worked fixed hours and was not subject to call. Transportation for him in the manner in which he was gaining it was deemed by the court the natural and contemplated means. His act in bringing the team to the site of the road construction work was, of course, beneficial to the employer.

The reason we mentioned the call feature of the above cases is because it may be easier to infer that an accident arose in the course of employment if the workman was on duty all hours around the clock, but it will be noticed that the call feature alone did not suffice in any of the above cases to establish that the injury arose in the course of the work. In each instance, the court found that the workman was doing something at the time of his injury which was beneficial to the employer. But, even if a workman, who met with an accident before the morning whistle blew, was not subject to call it may, nevertheless, be that the injury was incurred in the course of his employment if he was doing something at that time for his employer which his duties, expressly or impliedly, required him to do. Accordingly, the fact that the workman carried with him impedimenta of his employment when he drove to his place of employment may tend to show that the trip was made, in part at least, for his employer's benefit and pursuant to duty. We pause to note that the mere fact that a workman carried with him impedimenta while proceeding to his place of employment when an accident befell him does not alone show that the accident occurred in the course of the employment, for if the workman was, for example, a carpenter who was carrying with him his kit of tools, obviously, the conclusion would be that he was carrying them for his own benefit and not as a duty to his

employer. It is necessary, therefore, to show that the impedimenta were carried, in part at least, for the employer's benefit and as the result of an express, or implied, duty to the employer.

■ We believe that the record warrants a belief, as we have stated before, that the employers were under an implied obligation to furnish a means whereby the men could cross the bay. In short, they rendered the tugboat available to the men as an incident of the contract of employment. The excerpt which is quoted in a preceding paragraph from Schneider, Workmens Compensation Text, Perm Ed, § 1751, justifies the belief just expressed. See, also, *Rubeo v. McMullen Co.,* 117 NJL 574, 189 A 662, 118 NJL 530, 193 A 797. If we pause for a moment and contrast the employers' lack of interest in the means whereby the men went from their homes to the boat landing with the fact that the employers provided a boat whereby the men could go from the boat landing to the log boom site, we have additional reason for the conclusion just stated. The employers provided no automobile in which the men could ride from their homes to the boat landing. We also believe that the employers' interests were served as the men were bringing to the incomplete log boom a piece of equipment [the boat] which was essential in the construction of the boom. Had they not brought King's boat they would have fetched the employers'. It is true that the men were in the boat and that it afforded them transportation, but in that respect the case is like *Davis v. Bjorenson,* supra, *Jones v. Texas Indemnity Insurance Co.,* supra, and *Driscoll Construction Co. v. Industrial Commission of Colorado,* supra. We conclude that the act of King in bringing the boat across the bay served the interests of the employers and was of direct benefit to them. In other words, when

the accident occurred, King and his co-workers were performing a service for the employers which constituted a part of their duty. Thus, while they were taking the boat to the scene of their work they were engaged in the course of their duties.

Without carrying the analysis further, we express our conclusion that King's death resulted from an accident which arose out of and in the course of his employment.

In citing and reviewing the authorities to which we have resorted, we do not imply that if the facts in any one of them find a counterpart in a case that may in the future come before us, we would decide it the same way. We do not deem ourselves bound by fact holdings in decisions to which we resort by way of analogy or analysis. See 21 CJS, Courts, p 313, § 190.

We adhere to our previous opinion.

PERRY, C.J., LUSK and BRAND, JJ., concur.

McALLISTER, J., specially concurring.

In a petition for rehearing the defendant contends that the death of King was not caused by accident arising out of and in the course of his employment. Defendant argues that at the time of the accident King was not at work but was on his way to work, was in his own conveyance, was not on the employer's premises, and was being paid for neither the use of the conveyance nor for the time in going to and from work.

The petition relies on the following statement contained in a closing paragraph of the original opinion:

"Without again analyzing the testimony, we express our belief that it warranted a finding that the construction of the log boom was performed by King as an employee and that at the time of his death he was *on his way* to resume work upon that object. * * *" (Italics supplied)

Taken out of context, the above statement tends to lend support to defendant's contention but from a reading of the entire opinion it is apparent that the court was then considering whether on the morning of his death King was an employee of Huber and Fisher and not whether at the exact time of his death King was acting in the course of his employment. There is no evidence that King had reached the log boom and resumed the stringing of the boom sticks at the time of his death but that is not decisive of the question.

In *Lamm v. Silver Falls Tbr. Co.,* 133 Or 468, 499, 277 P 91, this court, after an exhaustive consideration of the authorities, adopted, among others, the following rule for determining whether an injury to a workman arises out of and in the course of his employment:

"* * * (1) An employee upon whom an injury is inflicted, while being conveyed to or from his work in a conveyance furnished by his employer as an incident of the contract of employment, is generally held entitled to compensation: American Coal Mining Co. v. Crenshaw, 77 Ind. App. 644 (133 N. E. 394); New Staunton Coal Co. v. Industrial Com., 304 Ill. 613 (136 N. E. 782); Central Const. Co. v. Harrison, 137 Md. 256 (112 Atl. 627); In Re Donovan, 217 Mass. 76 (104 N. E. 431 Ann. Cas. 1915C, 778); State v. District Court, 141 Minn. 348 (170 N. W. 218); Fisher v. Tidewater Bldg. Co., 96 N. J. L. 103 (114 Atl. 150); Littler v. George A. Fuller Co., 223 N. Y. 369 (119 N. E. 554); DeCamp v. Youngstown Municipal Ry. Co., 110 Ohio St. 376 (144 N. E. 128); McClain v. Kingsport Improvement Corp., 147 Tenn. 130 (245 S. W. 837); Richards v. Morris, 110 L. T. R. (N. S.) 496; E. Clemens Horst Co. v. Hartford Acc. & Indemnity Co., 27 Fed. (2d) 42; Norwood v. Tellico River Lumbr. Co., 146 Tenn. 682 (244 S. W. 490, 24 A. L. R. 1227); Anderson v. Hickman & Co., 21 Butterworth's Workmen's Compens. Cases, 369; Hackley Co. v.

Industrial Comm., 165 Wis. 586 (162 N. W. 921 L. R. A. 1918A, 277); Scalia v. American Sumatra Tobacco Co., 93 Conn. 82 (105 Atl. 346); Morrison v. Owners, etc., 21 B. W. C. C. 163; Wirta v. North Butte Mining Co., 64 Mont. 279 (210 P. 332, 30 A. L. R. 964), and Prof. Francis H. Bohlen, 25 Harv. L. Rev. 401. * * *"

In my opinion, this case falls within the foregoing rule and I concur in that portion of the opinion of the majority which so implies.

In this case the workmen traveled to the dock at the edge of Alsea Bay in a pickup truck. At the dock the usual journey to the place of employment by motor vehicle over public highways ended. The vehicle was parked and the men completed preparations to engage in their employment by lacing on their logging boots and donning their hard hats. They were then ready to be conveyed by the employer across the bay to the site of the actual labor. Although the bay was open to travel by the public, it is not a means of travel usually used by individual workmen in going to and from work. It is not reasonable to assume that Huber and Fisher expected each workman to furnish his own boat and to make his own way to the log boom on the other side of the bay by rowing, or if this was too laborious, to furnish a motor at his own expense. In any event it is not necessary to make any such assumption because it clearly appears from the evidence that a tug was furnished by the employer as a means of conveying the workmen to and from the dock and the log boom and that the tug was used for that purpose many times.

It seems clear that Huber and Fisher could not have carried on the business of constructing the log boom without furnishing a means whereby the workmen

could cross the bay to the place of the work and at the close of the day return to their vehicles. Transportation by water was vital to the employer's operations. It is significant that when King was engaged in the performance of his logging contract as an employer he transported his men across the bay. It is conceded by the defendant in its petition for rehearing that when King was the employer "the transportation was part of the contract of employment with King." When King changed to the role of an employee the duty to furnish the water transportation shifted to Huber and Fisher and was accepted and performed by them. In my opinion, the transportation across the bay was an incidental if not an express term of the contract of employment between Fisher and Huber and the workmen, including King, who were engaged to construct the log boom.

A question is raised in this case because for some reason which does not clearly appear from the record, King at times chose to use his own boat in lieu of the boat furnished by his employer as a means of conveying himself and his fellow workmen to the log boom. It was necessary for the men to use a boat in stringing the boom sticks and it is possible that King's boat was more suitable for the work to be performed on the day of the accident than the employer's tug. Whether that or some other reason caused King to use his own boat, it was still being used as an incident of the contract of employment. The ownership of the boat in this instance creates a distinction without a difference. It would be illogical to hold that these workmen were in the course of their employment when they rode to and from work in the employer's tug but were not in the course of their employment when riding across the bay in a boat substituted by the foreman and used for

the benefit of the employer in lieu of the employer's tug.

In this case the fact that King at times substituted his boat for the tug was apparently known to the employer. When the King boat was used with the acquiescence of the employer, it was in effect adopted by the employer as a means of furnishing transportation under the contract of employment.

There is no evidence indicating whether the men were paid for the time spent in crossing the bay but such payment is not necessary to bring the men within the course of their employment. See *I-L Logging Co. v. Mfgrs. & Whlse. Ind. Exc.*, 202 Or 277, 273 P2d 212 and *Lamm v. Silver Falls Tbr. Co.*, supra.

I am unable to agree with that part of the majority opinion which holds in effect that an injury sustained by a workman while traveling to and from work on a public highway in his own conveyance arises out of and in the course of his employment because he is carrying on his person or in his vehicle "impedimenta of the employment." The majority opinion attempts to limit the application of this rule to impedimenta carried for the benefit of the employer. Upon analysis this limitation is without substance because the mere act of the workmen in getting to work is of some benefit to the employer.

If the Workmen's Compensation Act is to be amended to cover every employee during travel to and from work who carries the keys to the office or plant or papers to study or work upon at home, such amendment should be made by the legislature and not by this court. The implications inherent in the majority opinion will unduly enlarge the coverage of the act, render the extent of the enlargement uncertain and

necessitate many supplementary decisions by this court before the scope of the opinion is finally delineated.

In this day of car pools, is only the employee who carries the keys in the course of his employment or does the rule apply to his fellow workmen riding in the same vehicle? Does coverage extend only to the lawyer on a regular retainer when carrying the legal papers of a client subject to the act, or are we extending the coverage to lawyers retained only temporarily to handle a particular legal matter? These and a host of similar questions will be settled one way or another in this court before the ramifications of the majority opinion are fully explored. The attempt in the majority opinion to cast doubt upon the soundness of the very authorities upon which the opinion is based will not discourage ingenious and determined efforts to extend the coverage over the complete area thrown open by the majority opinion.

I particularly disagree with those portions of the opinion which hold that horses furnished by a workman and used by him in the service of the employer are for the benefit of the employer but that tools furnished by a carpenter and used by him in the service of the employer are for the benefit of the carpenter and not the employer. Upon what difference this distinction is based and to what fine discriminations it will ultimately lead will only be ascertained by further litigation.

WARNER and KESTER, JJ. join in this opinion.

On respondent's motion for allowance of attorneys' fees.

Luvaas & Cobb and Joe B. Richards, Eugene, for respondent.

Robert Y. Thornton, Attorney General, Earl M. Preston and Ray H. Lafky, Assistant Attorneys General, Salem, for appellant.

ROSSMAN, J.

This cause is before us again, this time upon a motion filed by the plaintiff for the allowance to her of compensation for her attorneys for the services they performed for her from the inception of the claim to its final disposition in the foregoing opinions of this court. The total which is sought is $1,530. The latter is composed of the following amounts:

(1) For services performed before the
State Industrial Accident Commission ........$  250.00
(2) For services rendered in the Circuit
Court ---------------------------------------------------------- 680.00
(3) For services rendered in the Supreme Court ------------------------------------------------- 600.00
                                                             _____
                                                              $1,530.00

The plaintiff depends upon ORS 656.292, the pertinent part of which reads:

"In case of an appeal by the commission from an adverse decision of the circuit court, if the judgment of the circuit court is affirmed, the claimant shall be allowed attorneys' fees, to be fixed by the court, in addition to the compensation."

There must be read in connection with that section of our law ORS 656.588, which says:

"(1) In all cases involving accidental injuries occurring on or after July 1, 1951, where an injured workman prevails in an appeal to the circuit

court from a commission order rejecting his original claim for compensation, the commission shall allow a reasonable attorney's fee to the claimant's attorney. This attorney fee shall be paid from the Industrial Accident Fund as an administrative expense.

"(2) In all other cases attorneys' fees shall continue to be paid from the claimants' award of compensation."

From the foregoing, we see that 656.292 pertains to an appeal by the commission from a decision of the circuit court which affirms that court. In an instance of that kind, "the claimant (that is, the successful respondent) shall be allowed attorneys' fees, to be fixed by the court." That section of our laws won its present phraseology in 1945 when Oregon Laws 1945, ch 303, was enacted. In its previous form (§ 102-1774, OCLA) it did not authorize the award of attorneys' fees.

ORS 656.588 became a part of our Workmen's Compensation Act as Oregon Laws 1951, ch 330. It is, therefore, a later enactment than ORS 656.292. It will be noticed that 656.292 authorizes "the court" to fix the fee, and the latter, upon allowance, is "in addition to the compensation." But that section pertains to an appeal from the circuit court. ORS 656.588, which pertains to the circuit court and the allowance of an attorney's fee for the claimant, directs that the amount of the fee shall be allowed by the commission. The fee is paid out of the Industrial Accident Fund "as an administrative expense." For the sake of completeness, we take note of the fact that Oregon Laws 1957, ch 558, gave ORS 656.588 a new form so that it now provides that in all cases involving accidental injuries which occurred on or after July 1, 1957, wherein the claimant prevailed upon appeal to the circuit court from a com-

mission order which rejected his claim for compensation, "the court shall allow a reasonable attorney's fee to the claimant's attorney" to be paid out of the Industrial Accident Fund as an administrative expense.

It will be recalled that this cause came before us as "an appeal by the commission from an adverse decision of the circuit court" and that our opinion affirmed the decision of the circuit court (309 P2d 159). Thereafter the commission filed a petition for a rehearing which, after being allowed, resulted in an adherence to our previous opinion (315 P2d 148).

ORS 656.292, as we have seen, had its origin in § 102-1774, OCLA, as amended by Oregon Laws 1945, ch 303. The latter prompted this court, in *Green v. State Industrial Accident Commission,* 197 Or 160, 251 P2d 437, 252 P2d 545, to award the claimant an attorney fee for services performed in this court upon affirming the judgment order of the circuit court. That case, like the present one, was an appeal by the commission from an adverse decision of the circuit court.

The Oregon State Bar has promulgated an Advisory Schedule of Minimum Fees and Charges which includes in its ambit services performed under our Workmen's Compensation Act. The schedule, in the form in which it then existed, received attention in *Cox v. State Industrial Accident Commission,* 168 Or 508, 121 P2d 919, 123 P2d 800, and *Hinkle v. State Industrial Accident Commission,* 163 Or 395, 97 P2d 725. According to the current schedule, counsel for a respondent, such as the plaintiff, should be entitled to a minimum of $200 for making an appearance in this court and preparing a brief. The schedule contemplates that for an oral argument in this court he should receive $150. It also includes this item, "Petition for rehearing, $100.00." The part of the schedule which concerns the amount

of fees earned for services performed before the commission is included in the latter's reprint of the Workmen's Compensation Law.

As is apparent from our two foregoing opinions, this cause presented difficult issues. Counsel for the plaintiff (respondent) made appearance in this court and prepared an able brief. They delivered before us two oral arguments. The second was necessitated by the fact that the commission's petition for a rehearing was granted and, pursuant to a suggestion from the court, took as its subject matter a phase of the case which had not seemed important when the case was first argued. Before the oral argument, counsel for the plaintiff filed with the court a typewritten brief which presented their views upon the issues developed in the petition for a rehearing.

Applying the minimum schedule of fees to the situation just portrayed, the plaintiff should be allowed:

| | |
|---|---|
| Appearance and brief | $ 200.00 |
| Two oral arguments | 300.00 |
| Brief upon rehearing | 100.00 |
| | $ 600.00 |

The total just mentioned is the exact amount which the plaintiff requests.

We see from the Bar's schedule that the amount which is represented by the above figures is minimal. The issues in this case were not of minimum difficulty, and the results achieved by counsel for their client did not yield for her a minimum return. The ethical principle from which ORS 656.292 springs, that the defeated appellant shall pay the attorney's fee of his successful antagonist, is new in this jurisdiction and

singles out, in this instance, only one of the litigants that appear before the courts. In determining the amount of the fee which the Industrial Accident Commission must pay, the fee should not be made so burdensome that the commission will be deterred from resorting to the courts upon claims which it believes are without merit. Accordingly, we think that we are justified in embracing the minimum amounts, especially in view of the fact that the plaintiff's petition asks for no more. The award, in the terms employed in ORS 656.292, will be "in addition to the compensation."

■ We come now to the amounts which are sought for services performed by plaintiff's counsel in the circuit court and before the Industrial Accident Commission. We quoted in preceding paragraphs the sections of our laws which entrust the allowance of attorneys' fees payable out of the Industrial Accident Fund for services which are not governed by Oregon Laws 1957, ch 558, to the commission. In view of that fact, we have no authority to award any fee in this matter except the one which we have allowed in the amount of $600. This cause is remanded to the circuit court so that it may refer it to the commission to fix a reasonable attorney's fee.

In view of the fact that the mandate was issued (September 27, 1957) before the present motion was filed (October 19, 1957), it will be recalled so that the above awards may be made.