Argued April 5, modified and remanded with instructions
November 24, 1972

# TIMBER ACCESS INDUSTRIES CO., *Respondent,*
# *v.* U. S. PLYWOOD-CHAMPION PAPERS, INC.,
## *Appellant.*
### 503 P2d 482

*Barnes H. Ellis,* Portland, argued the cause for appellant.

*James R. Moore* and *Ridgway K. Foley, Jr.,* Portland, argued the cause for respondent.

Before DENECKE, Presiding Justice, and HOLMAN, BRYSON, SCHWAB and FOLEY, Justices.

HOLMAN, J.

Plaintiff, Timber Access Industries Co. (Timber Access), brought an action for breach of contract against defendant, U. S. Plywood-Champion Papers, Inc. (Plywood). From a judgment for plaintiff entered pursuant to a jury verdict, Plywood appeals.

Timber Access purchased timber at a U. S. Forest Service sale and entered into a contract to sell to Plywood therefrom, at a specific price, six million board feet of "peeler" logs to be delivered to Plywood's Willamina plant. The contract was in writing and was signed by Frank Ramsey, president of Timber Access, and by James W. Girard, operations manager of Plywood's Willamina plant.

The contract contained the following provisions:

"4.1 Seller shall log the Timber Sale and deliver approximately 6 M M.b.f. of logs as covered by this agreement between May 2, 1966, and November 30, 1966.

"4.2 In no event shall Purchaser be required to buy logs after November 30, 1966, in excess of the 6 M M.b.f."

During the course of the contract, the log market weakened and the price went down. On November 23, 1966, Plywood wrote a letter to Timber Access, informing it that Plywood would not accept any log deliveries after November 30. The letter was signed by Leonard Kostur, who had succeeded Girard as operations manager of the Willamina plant. By the time Plywood terminated acceptance of deliveries, it had received 4,185,910 board feet of logs. The first issue in the case is whether Plywood's obligation to purchase six million board feet of logs was uncondi-

tional or whether it was on the condition that the logs were to be delivered by November 30.

■■ Plywood first contends that the trial court erred because it did not give judgment to Plywood upon the pleadings. It argues that the contract is not ambiguous in that it provides that before there was an obligation to take six million board feet, the logs must have been delivered by November 30. Had paragraph 4.2 not been in the contract, Plywood's contention would be correct. Paragraph 4.1 is clear enough and provides that the logs must be delivered by November 30. However, the inference of the provisions of paragraph 4.2 is that Plywood was required to accept logs after November 30 up to a total of six million board feet. Because the provisions of the two paragraphs are inconsistent, the contract is ambiguous. The trial court did not err in refusing to grant judgment on the pleadings.

Plywood next contends that a nonsuit should have been granted since the evidence bearing upon the parties' intentions indicated that the purchase was conditioned upon the delivery of the logs by November 30. We hold that the evidence was not such as to be conclusive of the parties' intent. It was a jury question.

■ Over defendant's objection that it was hearsay, the court permitted Ramsey, plaintiff's president, to testify that after he had received the letter from Kostur refusing to take logs after November 30, he called Girard, who was then the operations manager of Plywood's Gold Beach plant, and was told by Girard that it had been his intent to buy the logs unconditionally and that Plywood had bought and was obligated to take six million board feet of logs. Girard died prior

to trial. Plywood contends the court erred in receiving this testimony.

The presently recognized definition of hearsay is stated in McCormick on Evidence § 246, at 584 (2d ed 1972):

> "* * * *Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.*" (Emphasis in original; footnote omitted.)

Because the person making the statement is not under oath nor is subject to cross-examination, and the jury has no opportunity to observe or to evaluate his demeanor, the truthfulness of the statement is suspect.

There is no doubt that the testimony in question is hearsay. Girard's out-of-court statement was used for the purpose of proving that Plywood unconditionally agreed to purchase six million board feet of logs. Therefore, unless the testimony came within an exception to the hearsay rule, it was not admissible. The exceptions to the rule usually encompass situations in which the out-of-court statements are made under circumstances which guarantee the probable trustworthiness of the statements.

■ Plaintiff first argues that Girard's statement comes within the vicarious admission exception to the hearsay rule because it was made by Girard as Plywood's agent. *McCormick* points out that in the past most cases have held that the admissibility of an agent's statement against the principal is governed by the same test used to determine the substantive liability of the principal for the agent's acts. In other words,

the determining factor was whether the admission was spoken within the scope of the authority of the agent to speak or to write for his employer. This principle was most frequently applied to postaccident admissions made by agents involved in the accident. The statements usually have been held inadmissible on the basis that the uttering of admissions for their principals was outside the scope of their employment. *McCormick* states at 641, § 267:

> "* * * This is the logical application of these tests, but the assumption that the test for the master's responsibility for the agent's *acts* should be the test for using the agent's statements as *evidence* against the master is a shaky one. The rejection of such postaccident statements coupled with the admission of the employee's testimony on the stand is to prefer the weaker to the stronger evidence. The agent is well informed about acts in the course of the business, his statements offered against the employer are normally against the employer's interest, and while the employment continues, the employee is not likely to make the statements unless they are true. Moreover, if the admissibility of admissions is viewed as arising from the adversary system, responsibility for statements of one's employee is a consistent aspect. Accordingly, the trend is in the direction of broader admissibility of admissions by agents, exemplified by the Model Code provision which lets in the agent's statement, if 'the declaration concerned a matter within the scope' of the declarant's employment 'and was made before the termination of the agency or employment.' Cases in increasing number support this wider test. Its acceptance by courts generally seems expedient." (Emphasis in original; footnotes omitted.)

The present state of the Oregon law is illustrated

by *Hansen v. Oregon-Wash. R. & N. Co.,* 97 Or 190, 218-19, 188 P 963, 191 P 655 (1920). This court said:

"* * * Stated broadly, the rule which allows admissions of an agent in an action against his principal applies only in two cases: (1) Where the agent is authorized to make an admission, as, for example, an attorney in the course of a trial; and (2) 'where the admission is in the form of a declaration made by an agent, while acting within the scope of his agency, and about the business of his principal, concerning such business.' A declaration made by the agent *dum fervet opus* tends to characterize the act which the agent is doing for his principal at the time, and is admissible on the theory that the whole transaction ought to appear, including not only what was done, but also what was said. Where, however, the declaration related to a past transaction in which the agent has acted for the principal, it is a mere historical narrative, and is inadmissible, unless the agent is empowered to make the admission for his principal * * *."

By virtue of his transfer to Gold Beach, Girard was no longer acting within the scope of his agency to conduct Plywood's business at Willamina at the time he made the statement. Had he continued as manager of the Willamina plant during the fulfillment of the contract and during which it was his business to act for Plywood in relation to the contract, his statement would have been admissible against Plywood, even under the restrictive Oregon rule. However, it is doubtful whether even the Model Code provision would admit the evidence in question because of the requirement of the Code that the declaration be made before the termination of the agency or employment.

Plaintiff contends that Girard had apparent authority to speak concerning the contract when he made the statement. There is no factual basis for be-

lieving that Girard had such authority, nor was there any evidence of action by plaintiff in reliance upon the statement.

■■ Plaintiff further contends that the testimony comes within the spontaneous declaration exception to the hearsay rule which admits declarations of a state of mind to show memory or belief as proof of a previous happening. Plaintiff claims that Girard's statement was admissible as a declaration of his mental state or belief, at the time he spoke the words to Ramsey, that he, Girard, had unconditionally purchased for Plywood six million board feet of logs. Plaintiff then argues it may be inferred from this present mental state that at the time of making the contract Girard did so unconditionally buy the logs. Generally speaking, courts have not admitted statements of memory or belief to prove past events except in will cases. There a testator's declarations, made after the alleged event, are received to show that he has or has not made a will or that he has made a will with particular provisions. *McCormick* states the rationale for the exception in will cases thusly:

"* * * Other courts have regarded these declarations as statements of belief or memory raising the circumstantial inference that the belief must have been prompted by facts, and therefore within the present exception. In the alternative, the declarations may be regarded not as statements offered to prove the truth of assertions contained therein, but as conduct circumstantially evincing a belief and thus not falling within a restrictive definition of hearsay." McCormick on Evidence § 296, at 702-03 (2d ed 1972). (footnotes omitted.)

Such reasons are unsatisfactory. If taken at face value, there would not be much left of the hearsay rule. The

principal reason for admitting hearsay testimony of a testator to prove the existence or nonexistence of his past acts is that he normally has no reason to lie about the matter, and, therefore, there is a special aura of trustworthiness about what he has said which is not present in most other hearsay situations.

Timber Access also contends that the testimony comes within the exception to the hearsay rule which admits declarations against the interest of the declarer. This exception must be distinguished from the vicarious admission exception where the declaration is against the interest of the declarer's principal and where the issue usually is not whether the declaration was against the principal's interest but whether the statement was made by the agent under such circumstances as to bind the principal. The exception presently under discussion requires the statement to be made against the *declarer's pecuniary* interest. *Hagberg v. Haas,* 237 Or 34, 38, 390 P2d 361 (1964). Plaintiff argues that the statement made by Girard was against his pecuniary interest since it made him subject to the loss of his job. There is no basis for this argument because there is no evidence indicating that at the time he made the statement Girard had any knowledge that it might cause him to lose his position.

In the present situation, Girard's purported statement concerning the conditions under which the logs were purchased does not fit nicely under any of the generally recognized exceptions to the hearsay rule. However, if the words were spoken, there is an aura of trustworthiness about them which makes evidence of them admissible. A manager of a plywood plant gets to be manager because of his employer's confidence in his business acumen. His ability to buy

logs advantageously in a widely fluctuating market is one of the reasons he holds his position. If he admits that he obligated his employer to buy unconditionally a volume of logs at a set price without a definite deadline, he is admitting that he made a disadvantageous deal and this would necessarily reflect adversely upon his ability. It is not natural, normal, or usual for a person to admit that he made what has turned out to be a poor deal unless, in fact, he did make it. Testimony concerning his statement should be an exception to the hearsay rule, not because he was acting as the agent of his employer at the time he made the statement; not because it was proof of a mental state or condition; not because it was an admission against his pecuniary interest; but because he was in a position to have knowledge of the facts, and a person in his position normally would not have made the statement unless it was the truth. The declarant's interest, although not pecuniary, was sufficient to assure that he was not lying and that the statement was not the result of any mistake of fact.

The limitation of admission of declarations against interest to those which fit neatly within the classifications of pecuniary or proprietary has long been questioned. *Wigmore* states that the exception is subject to arbitrary limitations resting on no reason at all. 5 Wigmore on Evidence § 1455, at 259 (3d ed).

*McCormick,* in discussing this exception, argues:

"Moreover, the restriction to material interests, ignoring as it does other motives just as influential upon the minds and hearts of men, should be more widely relaxed. Declarations against social interests, such as acknowledgments of facts which would subject the declarant to ridicule or disgrace,

or facts calculated to arouse in the declarant a sense of shame or remorse, seem adequately buttressed in trustworthiness and should be received under the present principle." McCormick on Evidence § 278, at 674-75 (2d ed 1972). (footnotes omitted.)

The admission of a statement which cannot be neatly categorized into one of the traditional exceptions to the hearsay rule is not unknown in this country. For example, in *G. & C. Merriam Co. v. Syndicate Pub. Co.*, 207 F 515, 518 (2d Cir 1913), Judge Learned Hand, then a district judge, having been unable to find a case on point which would allow the admission of a statement in the preface of a dictionary as evidence of the facts it recited, relied solely on Wigmore on Evidence and Wigmore's analysis that the requisites of an exception to the hearsay rule are necessity and circumstantial guaranty of trustworthiness. Wigmore on Evidence §§ 1421, 1422, 1690 (1st ed 1913). In *Dallas County v. Commercial Union Assurance Co.*, 286 F2d 388 (5th Cir 1961), the court followed the analysis of Judge Learned Hand in considering the admission of a newspaper article under Rule 43(a) of the Federal Rules of Civil Procedure. In closing its opinion, the court said:

"* * * We do not characterize this newspaper as a 'business record,' nor as an 'ancient document,' nor as any other readily identifiable or happily tagged species of hearsay exception. It is admissible because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge's exercise of discretion in holding the hearing within reasonable bounds." 286 F2d at 397-98.

■ Defendant has called to our attention that the statements attributable to Girard were not admissible under any Oregon statutes relating to the admissibility

of a decedent's declaration against his interest. It points out that

> "ORS 41.850 provides:
>
> > " 'The declaration, act or omission of a deceased person, having sufficient knowledge of the subject, against his pecuniary interest, is admissible as evidence to that extent against his successor in interest.'
>
> "ORS 41.860 renders admissible:
>
> > " 'Entries or other writings of like character of a person deceased or without the state, * * *'
>
> "when made
>
> > " 'against the interest of the person making it.'
>
> "ORS 41.900(4) makes admissible:
>
> > " '* * * the declaration or act of a deceased person, made or done against his interest in respect to his real property.' "

Although defendant does not say so, the implication might be that if the statutes do not provide for the testimony's admissibility, it is not admissible. The contrary is true. In the face of a similar contention, which included ORS 41.850, we said in *King v. Ind. Acc. Com.*, 211 Or 40, 309 P2d 159, 315 P2d 148, 318 P2d 272 (1957), as follows:

> "* * * Possibly the Shepard and Pratt opinions were remiss in overlooking the fact that the rules governing the admissibility of a deceased's declarations are broader than the sections of our laws which they cited * * *." 211 Or at 64.

There is another factor relating to the admissibility of evidence which has not been discussed by the parties and about which the members of this court have previously disagreed. A minority of the court has expressed the belief that, in a situation similar to the

present, the knowledge of the relator that he cannot be contradicted and his personal interest in so testifying, when added to the other dangers of hearsay, constitute sufficient justification for the inadmissibility of the testimony. See the dissenting opinion in *Wright v. Swann*, 261 Or 440, 451, 493 P2d 148 (1972). Thus far, the majority of the court has felt that under such circumstances it is proper for a jury to weigh both the likelihood that a statement was made as well as its correctness if it finds the statement was made.

■ Plywood also contends that the court erred in admitting into evidence a letter written by plaintiff's lawyer in response to Plywood's letter informing plaintiff that no logs would be accepted by Plywood after November 30. The letter contained a statement of plaintiff's position concerning the interpretation of the contract as well as a recitation of that which Girard had purportedly told Ramsey concerning what Girard believed was the intent of the parties in making the contract. The court admitted plaintiff's letter for the limited purpose of aiding the jury in deciding whether Ramsey was correctly relating the purported telephone conversation with Girard. The letter was self-serving and should not have been admitted to confirm what Ramsey said Girard told him. Admissibility in such a situation would permit Ramsey to write five letters to Plywood and to introduce all five of them to bolster his credibility. However, we believe the admission of the letter not to have been prejudicial in view of the introduction of Ramsey's oral testimony.

A material part of the controversy revolves around the proper measure of damages, the sufficiency of the evidence of damages, and the manner of computation. Plaintiff contends that because of the lack

of market for the logs which Plywood refused, plaintiff is entitled to loss of profits rather than to the difference between the market price and the contract price. The parties have agreed that ORS 72.7080 is applicable. It reads as follows:

"Seller's damages for nonacceptance or repudiation. (1) Subject to subsection (2) of this section and to the provisions of ORS 72.7230 with respect to proof of market price, the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in ORS 72.7100, but less expenses saved in consequence of the buyer's breach.

"(2) If the measure of damages provided in subsection (1) of this section is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in ORS 72.7100, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

Plywood counters by making two contentions. First, it states that damages are allowable under ORS 72.7080(2) only when (a) the goods are specially manufactured ones for which there is no substitute market; or (b) the seller of the goods has a stock of goods sufficient to supply all potential purchasers. Plywood then argues that neither category fits the present situation. Second, it contends that, in any event, there is insufficient proof of lack of market.

Neither party cites any authority directly in point concerning the contended limitation of the scope

of ORS 72.7080(2). If there is no market, there seems to be no reason for limiting the recovery of loss of profits to those situations where the lack of market is attributable to the uniqueness of the article. There is nothing in the comment of the drafters of the section (UCC § 2-708) which indicates any such stringent limitation to subsection (2).

Although there was evidence to the contrary, it is our conclusion that there was sufficient evidence to justify a finding that there was no market for the logs which Plywood had agreed to purchase from plaintiff. By market, we mean a market which, if availed of, would have substantially mitigated plaintiff's damages. There undoubtedly was some market; but, if the price was insufficient to justify plaintiff's costs of producing the logs, plaintiff could not have been expected to produce and sell them, nor would plaintiff's damages have been mitigated by its so doing.

In addition, Plywood contends the trial court erred because it left to the jury the question of whether there was a market. The court submitted the alternative measures of damages under ORS 72.7080 to the jury, the measure to be used depending upon how the jury found the facts. Plywood argues that the decision concerning the applicable measure of damages is one for the court instead of for the jury even if the decision has to be made upon disputed facts. There is no basis for reversible error in the court's submitting to the jury the determination of the factual question of whether there was a market for the logs. We find no record of any objection by Plywood to this method of procedure nor does Plywood, in its assignment of error, point out any such objection.

The jury returned a verdict for an amount of

damages equal to the maximum loss of profits claimed by plaintiff, the sum of $50,975.95. Plywood moved the trial court to instruct the jury that its consideration of plaintiff's loss of profits was limited to approximately $18,575.00, instead of $50,975.95, the amount submitted to them. The court's failure to so instruct is an assignment of error. In order to dispose of this assignment, it is necessary to enlarge upon the facts of the case.

Plaintiff's contract with the government required stumpage to be paid to the government at $56.35 per thousand board feet. It also required plaintiff to build roads through the area logged for future use of the government in reforestation and fire fighting. Plaintiff's cost of road construction was to be credited on its stumpage payments. At the time of the breach, plaintiff had an accumulated credit of $17,071.33, which credit was being applied on its stumpage costs at the rate of $17.86 per thousand board feet. As a result, plaintiff, at the time of the breach, was required to pay in cash only $38.49 per thousand board feet for stumpage rather than $56.35.

Plaintiff's testimony concerning its costs of producing the logs in its computation of loss of profits used a stumpage cost of $38.49 per thousand board feet. After verdict and before entry of judgment, Plywood convinced the trial court that at the rate of $17.86 per thousand board feet, plaintiff's road credit of $17,071.33 would have been consumed after the removal of 955,482 board feet of logs and that thereafter its costs of stumpage on the remaining 858,608 board feet would be increased to $56.35. As a result, pursuant to a motion notwithstanding the verdict, the trial court reduced the judgment by the amount of the purported additional stumpage costs to $35,647.95. Plaintiff cross-appealed from this reduction.

Plywood claims that the judgment is still too high by the amount of the unused road construction credit of $17,071.33. It argues that because plaintiff eventually transferred its rights under the contract with the government to a third party for an amount equal to its road construction credit, it recovered the amount of the credit twice: once in the damage for loss of profits and once in the transfer of its interest in the contract.

14. The parties' manner of stating their positions has in it a basic fallacy which has resulted in great confusion, not only to the parties, but to the trial court and to this court as well. Everyone has assumed that the stumpage cost somehow changed as the rate of amortization of the road credit changed. The construction credit and the rate at which it was being used up per thousand were entirely irrelevant to plaintiff's costs and, thus, to its profits. The credit was nothing more than an advance stumpage payment made by plaintiff by the performance of work rather than in money. Plaintiff's stumpage cost was $56.35 per thousand board feet, and this cost could not be changed regardless of whether plaintiff paid part of the stumpage cost in advance of the removal of the logs by the performance of work or whether it paid the entire cost in money at the time of removal.

When plaintiff's loss of profits is computed by using a stumpage cost of $56.35 per thousand board feet instead of $38.49 per thousand board feet for the 1,814,090 board feet of logs which were undelivered at the time of the breach, plaintiff's maximum loss of profits is $18,576.30, and the trial court should have limited the jury's consideration of the loss of profits to that amount, as requested by Plywood.

■ Plaintiff contends the amount of the verdict can be justified on the basis of the application of the other measure of damages which was submitted to the jury, i.e., the difference between the contract price and the market price. Plaintiff argues that a computer printout of logs received by defendant immediately after the breach shows that they were paying as low as $34 per thousand for logs from other suppliers, and the difference between this price and the contract price of $90.47 per thousand was more than enough to justify the verdict. We cannot accept plaintiff's contention because there is no evidence of the circumstances surrounding the acquisition of the logs reflected in the computer printout. We do not know whether the price of these logs as shown by the printout was determined by the then market price or by a price previously determined by contract. In other words, without further evidence, we cannot accept the printout as reflecting the market price for logs at that time. The contention is obviously an afterthought in an attempt to uphold the judgment.

The case is remanded to the trial court with instructions to reduce the amount of plaintiff's judgment for damages to $18,576.30, and to allow the trial court to reset plaintiff's attorney fees (provided by the contract) if it deems such procedure to be proper.