**In re S.N.A. NUT COMPANY, Debtor.**

**S.N.A. Nut Company, Plaintiff,**

**v.**

**The Haagen-Dazs Company, Defendant.**

**Bankruptcy Nos. 94 B 5993, 96 A 1237.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 5, 2000.

See also 226 B.R. 869, 231 B.R. 12.

Catherine Steege, Frances Gecker, Jerry L. Switzer, Jr., Jenner & Block, Chicago, IL, for Plaintiff.

James R. Figliulo, Peter A. Silverman, Figliulo & Silverman, Figliulo & Silverman, P.C., Chicago, IL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ, Bankruptcy Judge.

The debtor, S.N.A. Nut Company ("SNA"), filed a two-count Amended Com-

plaint against the Haagen–Dazs Company, Inc. ("HD"), alleging that SNA and HD entered into five contracts for the purchase and sale of specially manufactured nut products to be used in HD's ice cream. In Count I, SNA seeks damages in the amount of $981,866 for breach of all five contracts. In Count II, SNA seeks damages in the same amount, based upon a theory of promissory estoppel. HD's Answer included fifteen affirmative defenses.

Partial summary judgment has been entered in SNA's favor as to the existence and terms of three of the contracts. Partial summary judgment was also entered in SNA's favor on several of HD's affirmative defenses[1].

The parties had trial on four major issues. The first issue was whether SNA and HD entered into contracts for diced walnuts and macadamia nut brittle for mini-cups (the "Minis"). The second issue was whether HD breached any of the contracts in question. The third issue was whether HD was excused from performance under any of the contracts. The fourth major issue was the calculation of SNA's damages from any unexcused breach by HD.

The evidence presented at trial: (1) established the existence and terms of the contracts for diced walnuts and Minis; (2) proved that HD breached all five contracts; (3) showed that HD was partially excused from performance under a contract for almonds but was not otherwise excused; and (4) demonstrated that HD is liable to SNA for damages in the amount of $921,978.49 plus statutory interest at the rate of 5%.

# I. JURISDICTION

This is a non-core, related proceeding under 28 U.S.C. § 157(c)(1). HD does not consent to this Court's entry of a final order.

# II. FINDINGS OF FACT

To the extent these findings of fact contain a conclusion of law, it will stand as an additional conclusion of law; if any conclusions of law contain a finding of fact, it will stand as an additional finding of fact.

On March 2, 1994, several nut growers filed an involuntary bankruptcy petition against SNA under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* In a March 4, 1994 letter, SNA told its customers about the bankruptcy filing and advised them that SNA intended to continue its business as usual. On March 24, 1994, SNA converted the involuntary petition to a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

In June, 1994, SNA sought approval to sell its business as a going concern. SNA's creditors elected not to proceed with the sale.

In October, 1994, SNA's lenders and creditors decided that SNA should liquidate rather than reorganize because SNA could not recapitalize in time to purchase nuts from the 1994–95 harvests. The constituents agreed that SNA would continue to process existing inventory, would honor its contractual obligations, and would sell open inventory at fair market prices.

On January 12, 1995, SNA's Chapter 11 plan was confirmed.

SNA alleges that after the bankruptcy petition was filed HD breached five contracts: (1) a contract for the supply of

---

1. On November 20, 1998, summary judgment was entered in SNA's favor on four of HD's affirmative defenses: (1) statute of frauds (First Affirmative Defense); (2) judicial estoppel (Fourth Affirmative Defense); (3) equitable estoppel (Fifth Affirmative Defense); (4) *res judicata* (Eighth Affirmative Defense). *S.N.A. Nut Co. v. Haagen–Dazs Co., Inc. (In re S.N.A. Nut Co.),* 226 B.R. 869, 878 (Bankr. N.D.Ill.1998). On March 29, 1999, summary judgment was entered in SNA's favor on HD's Thirteenth Affirmative Defense. *S.N.A. Nut Co. v. Haagen–Dazs Co., Inc. (In re S.N.A. Nut Co.),* 231 B.R. 12, 14 (Bankr.N.D.Ill.1999). On April 26, 1999, summary judgment was entered in SNA's favor on HD's Second, Twelfth, and Fifteenth Affirmative Defenses.

630,000 pounds of 1⅝ Diced Almond Pieces Dark Roast (the "Almond Contract"); (2) a contract for 121,020 pounds of roasted and salted small walnut pieces (the "Walnut Contract"); (3) a contract for 325,000 pounds of coated macadamia brittle (the "Macadamia Brittle Contract"); (4) a contract for 35,000 pounds of coated macadamia brittle fines (the "Fines Contract"); and (5) a contract for 200,000 pounds of coated macadamia brittle for mini-cups (the "Minis Contract"). Before trial, summary judgment was entered in SNA's favor as to the existence and terms of the Almond Contract, the Macadamia Brittle Contract, and the Fines Contract. *S.N.A. Nut Co. v. Haagen–Dazs Co., Inc. (In re S.N.A. Nut Co.)* (hereinafter *"SNA I"*), 226 B.R. 869, 874–76 (Bankr.N.D.Ill.1998). At trial, SNA had the burden of establishing the existence and terms of the Walnut Contract and the Minis Contract. SNA also had the burden of demonstrating that HD breached its contracts. HD had the burden of establishing its affirmative defenses. The measure of the burden of proof is preponderance of the evidence.

### A. Contract Formation

SNA is an Illinois corporation formerly located in Elk Grove Village, Illinois. SNA was one of the largest processors and distributors of nuts and nut-related products in the United States.

HD is a division of the Pillsbury Company, a Delaware corporation. During the time relevant to this lawsuit, HD's principal place of business was in Teaneck, New Jersey. HD is one of the leading manufacturers and distributors of premium ice cream and ice cream products in the United States.

The business relationship between SNA and HD began in 1984 when HD first purchased pecans from SNA. In later years, HD expanded its purchases from SNA to include other nut and candy products. HD and SNA worked together to develop several of these nut and candy products, including the product known as "coated macadamia brittle." SNA produced all finished goods for HD according to HD's specifications and instructions.

Eventually, HD's annual purchases from SNA rose as high as $9 million. By 1993–94, HD was purchasing many different nut and candy products manufactured by SNA to HD's specifications. SNA manufactured all finished products for HD at SNA's production plant in El Paso, Texas. The products were specially manufactured for HD and would sometimes be processed in stages.

Hank Rich ("Rich") was an independent food broker who procured HD's business for SNA. Rich was the primary contact between HD and SNA.

Until his retirement on December 31, 1993, Cliff Stecker ("Stecker") was HD's director of purchasing. When Stecker retired, Richard Reider ("Reider") replaced him.

### 1. Course of Dealing: Contract Formation Between the Parties

When HD and SNA worked out new agreements, Rich and Stecker or Rich and Reider negotiated the terms. Rich would then relay the proposed terms to SNA and SNA drew up a contract document. SNA sent the document to HD, knowing that HD would not sign and return it; HD did not sign contracts. SNA filed a copy of the contract in a drawer with other contracts for that year. After receiving the contract from SNA, HD would send back a purchase order reflecting the terms of the contract. The parties performed under the contracts over a period of time. HD requested delivery of goods as it needed them. SNA periodically sent HD a Contract Balance Form, showing the quantity of goods HD had already pulled and the quantity remaining to be pulled.

### 2. The Walnut Contract

At trial, Rich testified that, in November, 1993, he and Stecker negotiated a contract under which HD agreed to pur-

chase 121,020 pounds of diced walnuts by September 30, 1994. SNA generated a Sales Contract (Debtor's Ex. 10) dated November 29, 1993 that reflected these terms. The Sales Contract also shows a price of $4.10 per pound. Tom Dalton ("Dalton"), who became SNA's Chief Executive Officer during the course of the Chapter 11 proceedings, testified that he found a copy of the Sales Contract in a file drawer with all other contracts for that time period. Rich testified that he sent the Sales Contract to HD's headquarters at Glenpoint Center East in Teaneck, New Jersey. Rich further testified that HD never contacted him to object to the Sales Contract in any way. Rich also sent a Contract Balance report to HD (Debtor's Exs. 11, 14); the report indicates that SNA and HD had a contract for 121,020 pounds of small diced walnuts. Debtor's Exhibit 14 lists HD's orders for walnuts from November, 1993 through July, 1994. As of July 18, 1994, a balance of 67,620 pounds remained to be pulled. HD never questioned the Contract Balance report.

Stecker testified that he could not remember whether he entered into a 1993 contract for diced walnuts, but that he probably did so. Stecker testified that he could not remember whether he received the Sales Contract. He testified that before he retired he made agreements with SNA to purchase all of the products he had purchased the year before. In the prior year, HD agreed to purchase 100,000 pounds of diced walnuts from SNA.

SNA did not offer a confirming purchase order from HD into evidence and HD claims that it purchased walnuts on an as needed basis. However, the testimony of Rich and Stecker, together with supporting documents, outweighs HD's denial. The parties had a contract for 121,020 pounds of walnuts. The contract price was $4.10 per pound and the contract ran from November 29, 1993 through September 30, 1994.

### 3. The Minis Contract

Rich testified that he and Reider negotiated contracts for macadamia products in June, 1994. Reider's testimony did not contradict Rich's; Reider, HD's only witness, did not testify about negotiations for macadamia nut contracts. A June 2, 1994 letter from Reider to Rich confirms their agreement that HD would purchase 325,000 pounds of macadamia brittle and 35,000 pounds of macadamia fines. (Debtor's Ex. 34). In the letter, Reider stated that HD would purchase Minis as needed. (Debtor's Ex. 34).

Rich responded that, due to a shortage of macadamia nuts, SNA needed a firm quantity commitment for the Minis. (Debtor's Ex. 36). Rich suggested that, to be certain that SNA would be able to find the nuts to make the Minis, HD should commit to a contract for 175,000 to 200,000 pounds. (Debtor's Ex. 36).

On June 9, 1994, Rich and Reider agreed that HD would purchase 200,000 pounds of Minis from SNA. Rich made a note of this agreement on Reider's June 2 letter. He also sent a memo to both Reider and SNA in which he stated that he had added 200,000 pounds of Minis to the contracts. (Debtor's Ex. 38). SNA created a Sales Contract dated July 15, 1994 indicating that HD agreed to purchase 200,000 pounds of Minis. (Debtor's Ex. 17). Rich mailed the Sales Contract to Reider; HD never objected to the terms of the Sales Contract.

Rich's testimony and SNA's exhibits stand uncontradicted and establish that SNA and HD formed a contract for 200,000 pounds of Minis at a base price of $2.735 per pound. The contract expired on December 31, 1994.

### B. Contract Breach

HD did not take delivery of all the products it contracted for under the Almond, Walnut, Macadamia Brittle, Fines, and Minis Contracts. Each contract had a balance remaining at its expiration date. The

market prices of these nuts fell during the contract periods.

At the same time HD refused to pull products under these contracts, it was demanding that SNA perform under contracts for the purchase and sale of pecans. The price of pecans was rising during the period in question.

HD breached its contracts with SNA; the question is whether HD has established any excuse for its non-performance.

### C. HD's Defenses to Performance

Of the fifteen affirmative defenses originally asserted by HD, only three pertaining to contract performance remained for trial: (1) whether SNA failed to tender goods, thus excusing HD from further performance (HD's Third Affirmative Defense); (2) whether SNA repudiated the contracts by failing to provide HD with adequate assurance of performance (HD's Tenth Affirmative Defense); and (3) whether HD was entitled to cover a temporary shortage in SNA's supply of almonds by purchasing almonds from another manufacturer (HD's Fourteenth Affirmative Defense). After trial, HD withdrew its Tenth Affirmative Defense with prejudice.

### 1. Course of Dealing: Contract Performance

Due to freshness concerns, SNA did not manufacture all of the HD goods at once. HD supplied SNA with usage forecasts and SNA manufactured in response to these forecasts. The forecasts helped SNA set minimum inventory levels for HD products. To ensure that it did not run short of HD products, SNA usually produced more than the forecast called for.

SNA supplied HD with weekly inventory summaries. These reports showed how much of a given HD finished product SNA held in both warehouses and production facilities. They did not reflect any work in progress. SNA also generated inventory reports that tracked raw materials and work in progress, but did not send those reports to HD.

As HD's plants needed ingredients manufactured by SNA, the plant managers called Rich's office. Rich then arranged for delivery to the appropriate plant. SNA did not ship goods to HD unless HD called for a release or pull under the contracts. The goods had a limited shelf life. They were perishable and would become rancid after too much time elapsed. HD would only accept goods within ninety days of the date on which they were boxed.

### 2. HD's Cover of the Almonds Contract (Fourteenth Affirmative Defense)

SNA and HD had a contract for the sale of almonds. *SNA I*, 226 B.R. at 874. HD agreed to purchase 630,000 pounds of almonds at $3.75 per pound by August 31, 1994. At the time of the bankruptcy filing, SNA was performing satisfactorily under the almond contract.

Shortly after the bankruptcy petition was filed, Rich told Reider that, because of its financial problems, SNA was temporarily unable to process almonds for HD. Rich suggested that HD turn to alternative suppliers for almonds. Rich was aware that HD acted on his suggestion. Rich knew that as a consequence of hiring secondary suppliers, HD's use of SNA almonds would be reduced. Early March, 1994 was the only time Rich suggested that HD use alternate suppliers for almonds.

Beginning March 9, 1994, HD attempted to locate new sources for the products manufactured by SNA. In an interoffice memo dated March 11, 1994, Reider indicated that he had ordered 90,000 pounds of diced almonds from Blue Diamond because of SNA's "possible bankruptcy." (Debtor's Ex. 61).

On March 25, 1994, SNA sent HD an inventory summary indicating that SNA had no finished almonds at any of its facilities. The summary indicated that SNA was uncertain whether it would have finished almonds by April 21, 1994; nothing

but a question mark appears in the summary sheet for that date. (HD Ex. 89). However, the April 11, 1994 summary shows that SNA had 4,350 pounds on hand and estimated that it would have 15,000 to 30,000 pounds by April 18. On April 25, 1994, the summary shows SNA had a total of 6,325 pounds in its warehouses, 9,700 pounds cleared by the quality control inspectors, and another 12,975 pounds awaiting inspection.

In spite of the foregoing, by April 13, 1994 and thereafter, HD ordered most of its almond supply from Blue Diamond and was using SNA for backup only. (Debtor's Ex. 76, 77). From March through June 6,1994, HD did not order any almonds from SNA. Rich, Dalton, and Nick DiGregorio ("DiGregorio"), the vice-president of SNA, testified that SNA could have delivered if it had received orders.

HD placed only four orders for almonds with SNA after April 11, 1994. From March, 1994 through August, 1994, HD purchased 244,400 pounds of almonds from SNA and 435,150 pounds from other suppliers.

On June 9, 1994, Rich informed Reider that HD needed to pull 479,000 pounds of almonds to meet its contractual obligations. Reider replied, telling Rich that he was reducing the quantity term of the contract. Rich responded that SNA would not agree to a reduction of the contract. On August 31, 1994, when the contract expired, a balance of 385,600 pounds of almonds remained to be pulled.

### 3. SNA's Tender of the Goods (Third Affirmative Defense)

Rich, DiGregorio, and Dalton all testified that SNA was ready, willing, and able to complete performance under the five contracts if HD had placed orders for the products. Except for that pertaining to almonds for the period March 25, 1994 through April 11, 1994, HD produced no evidence that SNA would not have been able to perform if called upon to do so.

When SNA realized that HD had stopped pulling product under the contracts, it demanded that HD perform. As discussed in the preceding section, Rich wrote to Reider on June 9, 1994, demanding that HD take delivery of almonds. Later that year, Rich told Reider that HD was falling behind on its walnut and macadamia contracts. Rich testified that he spoke with Reider many times on this subject. Rich's undisputed testimony was that Reider refused to pull the products and told him to try to sell them elsewhere. Reider testified that he could not recall whether such conversations occurred.

Rich also had a series of conversations with Todd Brown ("Brown") and Bill Newman ("Newman") in HD's quality assurance department. Brown and Newman told him that HD was afraid that SNA employees, angered by SNA's impending liquidation, might sabotage products. Neither Brown nor Newman was able to point out any instance of sabotage to Rich. Brown and Newman also told Rich to try to sell the HD products to someone else.

In November, 1994, Dalton threatened to suspend shipments of pecans if HD did not complete the contracts here at issue. HD was desperate for pecans. In response, Kate Rose ("Rose") the Ingredients Manager at HD, requested that Dalton call her. At this time, SNA was still shipping those products that HD placed orders for.

Dalton called Rose on November 23, 1994. He told her that he wanted HD to take delivery of the products it had contracted for. He also told her that he wanted HD to pay for products it had taken. Rose refused to take delivery on the contracts and told Rich that HD was concerned about employee sabotage. Rose did not respond to Dalton's request for payment. In the same conversation, Rose demanded that SNA supply it with pecans.

Shortly after this conversation, Dalton received a letter from Richard Q. Russeth, HD's Vice President and General Counsel,

demanding that SNA perform under the pecan contracts. The letter did not address the subject of the other contracts. HD never ordered any more walnuts, almonds, or macadamia products from SNA.

### D. Damage Calculations and Defenses

Several of HD's surviving affirmative defenses relate to damages: (1) whether HD is entitled to set off any savings SNA may have realized against the amount HD owes to SNA (HD's Sixth Affirmative Defense); (2) whether SNA failed to notify HD of its intent to sell or otherwise liquidate goods purchased or manufactured for HD (HD's Seventh Affirmative Defense); (3) whether SNA failed to mitigate its damages (HD's Ninth Affirmative Defense); and (4) whether SNA's failure to hold the products in inventory precludes recovery of the contract price (HD's Eleventh Affirmative Defense).

#### 1. Damages Sought

SNA seeks damages in the amount of $987,145.69 plus prejudgment interest at 5%. The components of SNA's damage claim are: (1) a loss of $445,152.39 on the Almonds Contract; (2) a loss of $155,-862.70 on the Walnut Contract; (3) a loss of $320,353.80 on the Macadamia Brittle Contract; (4) a loss of $19,453.60 on the Fines Contract (5) and a loss of $46,775.60 on the Minis Contract.

#### 2. Setoff (Sixth Affirmative Defense)

HD asserted that it should be entitled to a setoff against any damages owed to SNA equal to the cost savings or other benefits which inured to SNA as a result of any breach by HD. However, HD did not offer any testimony or other evidence as to what SNA's cost of manufacture or benefits might be. HD did not even address this issue in its post-trial briefs.

Further, SNA calculated its lost profits as if it had incurred every cost of manufacturing and delivering the goods to HD. There is no evidence that SNA is seeking to recover costs that it actually saved.

#### 3. Failure to Notify of Intent to Resell or Liquidate (Seventh Affirmative Defense)

The evidence shows that HD was aware that SNA would try to resell the products. Rich and Dalton both testified that HD's representatives told them to sell the products elsewhere. This testimony was undisputed. The parties stipulated that the products were perishable and became rancid after a certain period of time. HD knew that once the products became rancid, they were valueless to anyone and had to be destroyed.

#### 4. Failure to Mitigate (Ninth Affirmative Defense)

The goods that SNA manufactured for HD were made using HD's recipes and according to HD's specifications. No other ice cream manufacturer or food producer used these finished products.

Each of SNA's five witnesses testified about his or her efforts to sell the HD products. SNA personnel contacted every SNA customer in an attempt to sell the finished HD goods. They contacted companies that were not HD customers and enlisted outside brokers and distributors. SNA sold a small quantity of the goods to other ice cream companies. As the products became too old for human consumption, SNA sold some of them to animal feed manufacturers. SNA destroyed the goods it could not sell once they became rancid.

The testimony was undisputed that SNA stopped manufacturing all HD products in November, 1994, following Rose's refusal to pull any goods under the contracts at issue.

#### 5. Failure to Hold Product (Eleventh Affirmative Defense)

The parties agree that HD would not accept any product more than ninety days after the date on which the product was

boxed. The parties also agree that the products at issue were perishable. SNA presented undisputed evidence that it did not destroy any product until it became rancid.

## III. CONCLUSIONS OF LAW

The parties agree that this action is governed by Article 2 of the Uniform Commercial Code (the "UCC"), 810 ILCS 5/2–101 *et seq.* (hereinafter "UCC § —").

### A. Contract Formation

■ The two contracts whose existence is at issue here are the Walnut Contract and the Minis Contract. The UCC provides that "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." UCC § 2–204(1). To establish the existence of a contract under this section, there must be evidence that an offer was accepted and that the parties agreed on the essential terms of the contract. *Dean Foods Co. v. Brancel,* 187 F.3d 609, 617 (7th Cir.1999).

SNA presented substantial evidence of the manner in which the parties regularly negotiated and finalized their contracts. It presented substantial evidence that both the Walnut Contract and the Minis Contract were negotiated and finalized in this same manner.

SNA established that the Walnut Contract ran from November, 1993 through September, 1994. HD agreed to purchase 121,020 pounds of walnuts at $4.10 per pound.

SNA established that the Minis Contract ran from June, 1994 through December, 1994. HD agreed to purchase 200,000 pounds of Minis at $2.735 per pound.

These contracts, and the other three contracts at issue, were installment contracts as defined by the UCC. "An installment contract is one which requires or authorized the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract.'" UCC § 2–612(1).

### B. Contract Breach

■ SNA claims that HD breached five contracts by failing to purchase all the goods contracted for. If a party to a contract fails to perform its contractual obligations when they become due, then that party is in breach. *In re Krueger,* 192 F.3d 733, 741 (7th Cir.1999); RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1981). HD does not dispute that it failed to order or accept the goods which it contracted to purchase. SNA has thus met its burden of proving that HD breached the five contracts.

### C. HD's Defenses to Performance

■ As defenses to its failure to perform under the five contracts, HD asserts that it was entitled to "cover" or purchase substitute goods under the Almonds Contract. HD also asserts that SNA failed to tender the goods under any of the contracts and that HD was thus excused from performance. HD had the burden of proving each of its affirmative defenses. *Bauer v. J.B. Hunt Transport, Inc.,* 150 F.3d 759, 763 (7th Cir.1998); *Pascal P. Paddock, Inc. v. Glennon,* 32 Ill.2d 51, 54, 203 N.E.2d 421, 423 (1964).

### 1. HD's Cover of the Almond Contract (Fourteenth Affirmative Defense)

■ HD argues that UCC § 2–711 permitted it to purchase almonds from other suppliers and reduce the balance of its contract with SNA once Rich told Reider that SNA was temporarily unable to supply finished almonds. That section provides in pertinent part:

Where the seller fails to make delivery or repudiates ... then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract ... the buyer may cancel and ... "cover" and have damages un-

der [§ 2–712] as to all the goods affected. . . .

UCC § 2–711. Section 2–712 provides that a buyer may cover a seller's breach by making good faith, timely purchases of, or contracts to purchase, substitute goods from another seller. UCC § 2–712(1). A "repudiation" is an unequivocal statement from a party that it is unwilling or unable to perform. RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (1981).

■ HD does not contend that SNA failed to make delivery. Nor has it overtly stated that SNA repudiated or partially repudiated the Almond Contract. However, it offers Rich's testimony regarding SNA's temporary inability to deliver almonds and the SNA inventory reports indicating that SNA had no almonds as justification of its actions in ordering from another supplier. Especially in light of Rich's March, 1994 recommendation to Reider that HD temporarily seek alternate suppliers, HD has established that SNA partially repudiated the Almond Contract. HD was thus entitled to cancel and cover that portion of the contract repudiated by SNA. HD does not and cannot seek damages for its cover; HD was able to buy the substitute almonds at a lower price than that it agreed upon with SNA.

■ The conclusion that HD could cover part of the Almond Contract does not mean that HD was entitled to consider the entire contract as terminated and thus to cover the bulk of the remaining contract balance, as it did. Rich was very clear about telling Reider that SNA's almond problems were temporary. The inventory sheets also clearly indicate that SNA was producing almonds and that its stock was growing. Reider never called Rich to ask about almond availability and Rich never again told Reider to seek alternate suppliers because SNA could not make the goods.

In March, 1994, HD ordered 90,000 pounds of almonds from Blue Diamond. It did so in response to Rich's warnings and recommendations. This is the amount that HD was entitled to cover and by which it could reduce the balance of the Almond Contract. SNA did not repudiate the balance of the contract and HD was not entitled to seek cover for it without further notice. HD's conduct in abandoning the contract because SNA told it about temporary problems was commercially unreasonable.

## 2. SNA's Tender of the Goods (Third Affirmative Defense)

■ HD claims that SNA never tendered delivery of the goods contracted for and therefore, that HD had no duty to accept or pay for the goods. "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." UCC § 2–503. Once the seller tenders the goods, the buyer is obligated to accept and pay for them according to the contract. UCC § 2–507. To prove tender, a party must show only that it notified the other party that it was ready and willing to deliver the goods. *Klockner, Inc. v. Federal Wire Mill Corp.*, 663 F.2d 1370, 1381 (7th Cir.1981); *Norton Iron Works v. Wilson Steel Products Co.*, 232 Ill.App. 523 (1924). The seller does not need to ship goods to show that it was ready and willing to perform; readiness and willingness may be shown by other competent evidence. *White Walnut Coal Co. v. Crescent Coal & Mining Co.*, 254 Ill. 368, 377, 98 N.E. 669, 672 (1912). Such competent evidence includes a showing that the seller requested that the buyer take delivery of the goods. *See Klockner*, 663 F.2d at 1380–81 (concluding that a letter in which the seller asked the buyer to fulfill its contractual obligations was clearly a sufficient tender); *Norton Iron Works*, 232 Ill.App. 523 (deciding that a seller's request to resume shipments indicated that the seller was ready and willing to perform).

■ It is very clear that, as part of a course of dealing established over many years, SNA did not deliver goods to HD unless and until HD ordered them. It is also clear that HD stopped ordering releases under the contracts at issue before completing its performance under the terms of those contracts.

The evidence is undisputed that beginning no later than June 9, 1994, SNA repeatedly requested that HD take delivery of almonds and walnuts. No later than November, 1994 it added requests that HD take delivery of the macadamia products.

HD argues that SNA did not have the full contract balance of finished goods on hand at the time the contracts expired. However, the evidence of the parties' course of dealing shows that SNA manufactured in response to HD's needs. Rich, DiGregorio, and Dalton all testified that SNA could have filled HD's orders. HD did not offer any evidence that SNA could not have filled its orders if it had placed them.

SNA tendered the goods and HD was obligated to accept and pay for them. HD was not excused from performance under its Third Affirmative Defense.

### D. Damage Calculations and Defenses

As to those finished goods that SNA was able to sell, SNA seeks only to recover the difference between the resale price and the contract price. SNA seeks only the difference between the purchase price and the resale price on raw materials; it has subtracted the amount of finished goods these raw nuts would have yielded from the total of goods neither manufactured nor taken. For those goods neither manufactured nor taken, SNA seeks only the profit, including overhead, that it would have earned from full performance by HD (the "Lost Profits").

■ Under the UCC, remedies are to be liberally administered; the injured party should be put in a position as good as if the breaching party had fully performed its obligations. 810 ILCS § 5/1–106. The UCC provides several remedies for a seller when the buyer has breached a contract. UCC § 2–703. SNA seeks damages in the alternative under three sections of the UCC's remedies provisions. It seeks one of the following: (1) the profit that it would have made from HD's full performance under UCC § 2–708(2); (2) the contract price under UCC § 2–709; or (3) the difference between the contract price and any resale price under UCC § 2–706.

### 1. SNA's Damages Under UCC § 2–708

SNA argues that UCC 2–708(2) is the proper measure of its damages because the goods at issue were manufactured specially for HD and had little or no value to anyone else.

■ Section 2–708 of the UCC applies when a buyer has either repudiated the contract or failed to accept the goods contracted for. UCC § 2–708. It provides two measures of damages. The first measure entitles the seller to the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article … but less expenses saved in consequence of the buyer's breach. UCC § 2–708(1). However, if this damage calculation does not put the seller in as good a position as if the buyer had performed, "then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages … due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." UCC § 2–708(2). The seller may not receive lost profits unless it has demonstrated that the market price remedy provided in § 2–708(1) would be inadequate. UCC § 2–708(2).

■ However, many courts have held that damages under UCC § 2–708(1) are inadequate for specially-manufactured

**20**

goods that cannot be resold. *Tigg v. Dow Corning Corp.*, 962 F.2d 1119, 1129–30 (3d Cir.1992); *Alter & Sons, Inc. v. United Engineers and Constructors, Inc.*, 366 F.Supp. 959, 966 (S.D.Ill.1973); *Madsen v. Murrey & Sons Co., Inc.*, 743 P.2d 1212, 1216 (Utah 1987); *Bead Chain Mfg. Co. v. Saxton Products, Inc.*, 183 Conn. 266, 277, 439 A.2d 314, 320 (1981); *Timber Access Industries Co. v. U.S. Plywood–Champion Papers, Inc.*, 263 Or. 509, 524–25, 503 P.2d 482, 489–90 (1972); *Anchorage Centennial Development Co. v. Van Wormer & Rodrigues, Inc.*, 443 P.2d 596, 599 (Alaska 1968); *Franklin v. Demico, Inc.*, 179 Ga.App. 775, 777, 347 S.E.2d 718, 720 (1986); *Detroit Power Screwdriver Co. v. Ladney*, 25 Mich.App. 478, 486–87,181 N.W.2d 828, 833 (1970). Whether goods are specialty items is a question of fact. *Tigg*, 962 F.2d at 1130. Such goods have no readily accessible market from which to determine market price. *Id.* "A formula basing damages on the difference between market price and contract price is without meaning in the context of a contract for a specialty item which has no market." *Detroit Power Screwdriver*, 25 Mich.App. at 486–87,181 N.W.2d at 833. A market must be a real market in which a sale of the goods would substantially mitigate the seller's damages. *Madsen*, 743 P.2d at 1216. If the goods are specially-manufactured goods, then damages under UCC § 2–708(2) should be awarded. *Tigg*, 962 F.2d at 1130.

■ The goods at issue were specially-manufactured goods. They were made for HD only, using HD's recipes and specifications. There was no market for the goods; the testimony was undisputed that no other food processor used nuts prepared according to HD's recipes. Thus, UCC § 2–708(2) is the proper measure of SNA's damages.[2] SNA is entitled to recover the profits it would have earned had HD per-

formed, including overhead, plus incidental damages, plus costs incurred, less proceeds from the goods it resold.

### a. The Almond Contract

At the expiration of the Almonds Contract, SNA had 121,871 pounds of finished almonds in inventory. (Debtor's Ex. 104). HD subsequently purchased 21,775 pounds of these almonds. SNA sold the remaining 100,096 (121,871–21,775) pounds to other purchasers at an average price of $2.80 per pound. The contract price between SNA and HD was $3.85 per pound. SNA thus claims a loss of $105,101 on the finished almonds ( [$3.85–$2.80] × 100,096 pounds).

SNA also had 187,069 pounds of raw almonds on hand, purchased for HD sometime during the almond harvest in the fall of 1993, but before January 1, 1994. The cost of these raw nuts, including carrying costs, was $2.59 per pound. After the Almond Contract's expiration, SNA sold the nuts for $1.44 per pound. SNA thus claims a loss of $215,129 on the raw almonds ( [$2.59–$1.44] × 187,069 pounds).

These raw almonds would not have produced an equal amount of finished product. According to Dalton and DiGregorio, if SNA had processed the raw nuts for HD, it would have had finished goods amounting to about half the weight of the raw nuts. After shelling and other processing of the 187,069 pounds of raw almonds, SNA would have had 93,535 pounds of finished almonds (187,069 ÷ 2).

■ As the third, and final component of its damages under the Almonds Contract, SNA seeks damages for the Lost Profits on goods neither taken nor manufactured. While Dalton's testimony regarding "net contribution margin" was needlessly complex and convoluted[3], "net

---

**2.** While the Illinois Supreme Court has not addressed this question, the volume of authority holding that UCC § 2–708(2) is the proper measure of damages for specially-manufac-

tured goods leads to the conclusion that the Illinois Supreme Court would so hold.

**3.** The "net contribution margin" theory became so confusing that at one point HD was

contribution margin" boils down to the profit SNA would have realized on the goods if HD had performed. That profit is determined by subtracting the cost of the finished goods, which is the sum of the raw material price, processing costs, allocation of fixed and variable costs, freight in, freight out, and brokerage costs, from the contract price. SNA's Lost Profits on the Almonds Contract would have been $.734 per pound.

SNA does not seek Lost Profits on the goods that it could have finished from the raw almonds on hand. It seeks Lost Profits on the balance of the contract (385,600 pounds) less the finished goods not sold to HD at the expiration of the contract (121,-871[4] pounds), less the goods that could have been produced from the raw almonds (93,535 pounds). It seeks Lost Profits on 170,194 pounds (385,600—[121,871 + 93,-535]) in the amount of $124,922.39 (170,194 pounds × $.734).

However, HD was entitled to reduce the contract balance by 90,000 pounds. Therefore, SNA may recover Lost Profits on a contract balance of 80,794 pounds (170,-194—90,000). SNA may recover Lost Profits of $59,302.79 (80,794 pounds × $.734).

SNA's total loss on the Almonds Contract is $379,532.79 ($105,101 for finished goods + $215,129 for raw materials + $59,302.79 Lost Profits on goods neither taken nor manufactured.)

### b. The Walnut Contract

The Walnut Contract expired on September 30, 1994. It expired with a balance of 67,670 pounds of walnuts remaining to be pulled.

arguing against the inclusion of factors whose exclusion would have increased the amount of damages. Dalton, who is a CPA, may have been technically correct in using the term, but he endangered his case by muddying what should have been clear waters.

4. SNA's damage calculations use the number 121,875 pounds, but this seems to be a typographical error.

On the expiration date, SNA had 37,525 pounds of finished walnuts in inventory. Of this inventory, SNA sold 15,840 pounds to other purchasers at an average price of $1.28 per pound. The contract price between SNA and HD was $4.13[5] per pound. SNA's loss on the finished walnuts sold to others is $45,144[6] ([$4.13–$1.28] × 15,840 pounds).

SNA destroyed 21,685 pounds of finished walnuts. At the contract price of $4.13 per pound, SNA lost $89,559 (21,685 pounds × $4.13).

SNA also had 6,411 pounds of raw walnuts on hand for HD. These walnuts cost $2.40 per pound, but, after the Walnut Contract's expiration, SNA sold them for $1.44 per pound. SNA thus claims a loss of $6,155 on the raw walnuts ([$2.40—$1.44] × 6,411 pounds).

As with the Almond Contract, described above, the raw walnuts would have yielded 3,205 pounds finished goods at a rate of 50% (6,411 pounds ÷ 2). SNA does not seek Lost Profits for these goods that could have been manufactured. It seeks Lost Profits on the balance of the contract (67,670 pounds) less finished goods sold (15,840 pounds), less finished goods destroyed (21,685 pounds), less goods that could have been made from raw materials (3,205 pounds). It seeks Lost Profits on 26,940 pounds (67,670—[15,840 + 2,685 + 3,205]). SNA's Lost Profits on the walnuts was $.555 per pound. Its net contribution claims is $14,951.70 ($.555 × 26,940 pounds).

SNA's total damages under the Walnut Contract are $155,862.70 ($45,197 + $89,-559 + 6,155 + $14,951.70).

5. Although the contract price for the walnuts was $4.10 per pound, SNA is entitled to carrying charges that bring the total price to $4.13 per pound.

6. SNA's damage calculation values this part of the claim at $45,197, but this seems to be a typographical or arithmetical error.

### c. The Macadamia Brittle Contract

The Macadamia Brittle Contract expired on December 31, 1994. It expired with a balance of 195,120 pounds of macadamia brittle remaining to be pulled.

On the expiration date, SNA had 105,280 pounds of finished macadamia brittle in inventory. SNA sold 21,320 pounds of this inventory to other purchasers at an average price of $.0635 per pound. The contract price was $2.74 per pound. SNA's loss on these finished goods is $57,063 ([$2.74—$.0635] × 21,320 pounds).

SNA destroyed 83,960 pounds of finished macadamia brittle. At a contract price of $2.74, SNA lost $230,050 on these goods.

SNA did not suffer any losses on raw macadamia nuts.

SNA seeks Lost Profits on 89,840 pounds of macadamia brittle neither taken nor manufactured (195,120 pounds contract balance—21,320 pounds—less 83,960 pounds). Its Lost Profits on this product was $.37. Its net contribution claim is $33,240.80[7] (89,840 pounds × $.37).

SNA's total damages under the Macadamia Brittle Contract are $320,353.80 ($57,063 + $230,050 + $33,240.80).

### d. The Fines Contract

The Fines Contract expired on December 31, 1994. It expired with a balance of 28,640 pounds.

When the contract expired, SNA sold 1,680 pounds of the finished macadamia fines to other purchasers at an average price of $.015 per pound. The contract price was $2.74 per pound. SNA's loss on these finished goods was $4,578 ( [$2.74—$.015] × 1,680 pounds).

SNA destroyed 2,120 pounds of finished macadamia fines. At a contract price of $2.74, SNA lost $5,809 ($2.74 × 2,120 pounds) on these goods.

---

7. SNA's calculates this number as $32,791.60, but this seems to be an arithmetical or typographical error.

SNA seeks Lost Profits of $.365 per pound on 24,840 pounds of fines neither taken nor manufactured (28,640 pound contract balance—1,680 pounds sold—2,120 destroyed). Its Lost Profits claim is $9,066.60 ($.365 × 24,840 pounds).

SNA's total damages under the Fines Contract are $19,453.60 ($4,578 + $5,809 + $9,066.60).

### e. The Minis Contract

The Minis Contract expired on December 31, 1994. There was a balance of 117,480 pounds remaining to be pulled under the contract.

When the contract expired, SNA had 1,640 pounds of finished Minis in inventory. It destroyed all of these goods. At a contract price of $2.74 per pound, SNA's loss on the Minis was $4,494 ($2.74 × 1,640 pounds).

SNA seeks Lost Profits of $.365 per pound on 115,840 pounds (117,840—1,640) of fines neither taken nor manufactured. Its net contribution claim is $42,281.60.

Its total claim under the Minis Contract are $46,775.60 ($4,494 + $42,281.60).

### f. Interest

■ SNA seeks interest on the debts from the expiration date of each contract. In Illinois, creditors are allowed interest at a rate of 5% for debts that result from a written contract and whose amount can be readily ascertained. 815 ILCS § 205/2; *Art Press, Ltd. v. Western Printing Machinery Co.*, 852 F.2d 276, 278 (7th Cir. 1988). HD's debt to SNA results from written contracts and the amount owing is readily ascertainable. HD must pay statutory interest on the debt.

### 2. Setoff (Sixth Affirmative Defense)

As discussed in the Findings of Fact, SNA has not requested damages for costs

it did not incur. HD has not offered any proof that it did. In its Lost Profits calculations, SNA has backed out any costs that it did not incur. Because there is no evidence that SNA is seeking to recover costs that it actually saved, HD's Sixth Affirmative Defense is denied.

*3. Failure to Notify of Intent to Resell or Liquidate (Seventh Affirmative Defense)*

The evidence shows that HD was well aware that SNA would somehow have to dispose of the perishable goods it had on hand for HD. HD's Seventh Affirmative Defense is denied.

*4. Failure to Mitigate (Ninth Affirmative Defense)*

The evidence shows that SNA did everything in its power to mitigate its damages. However, the goods were specially-manufactured for HD and there was no market for them. In addition, SNA stopped manufacturing when it became clear that HD would not accept the goods. HD's Ninth Affirmative Defense is denied.

*5. Failure to Hold Product (Eleventh Affirmative Defense)*

A seller's obligation to hold the product for the breaching buyer is only a requirement of UCC § 2–709(2) and not of UCC § 2–708(2). Thus, the affirmative defense has no application to the damage award. The Court further notes that a requirement that a seller hold rotten goods for several years would be ridiculous. HD's Eleventh Affirmative Defense is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that HD breached five contracts with SNA; that HD was entitled to reduce the balance of the Almond Contract by 90,000 pounds; that SNA was damaged in the total of $921,978.49 ($379,532.79 for the Almond Contract + $155,862.70 for the Walnut Contract + $320,353.80 for the Macadamia Brittle Contract + $19,453,60 for the Fines Contract + $46,775 for the Minis Contract); and because SNA's damages were readily ascertainable, that SNA is entitled to prejudgment interest at the statutory rate.